## Case No. 12,333.

### The SANTIAGO DE CUBA.

NORTH AMERICAN STEAMSHIP CO. v. LORILLARD.

MURPHY v. The SANTIAGO DE CUBA et al.

[10 Blatchf. 444.] [1]

Circuit Court, E. D. New York. Feb. 25, 1873. [2]

COLLISION — RIGHT OF WAY — CHANGE OF COURSE — PRESUMPTION — IMPROPER SCREENS — APPORTIONMENT OF LOSS.

1. In a collision between two steam vessels, the S. and the B., the 14th rule (Act April 29, 1864; 13 Stat. 60,) that, "if two ships under steam are crossing, so as to involve risk of collision, the ship which has the other on her own starboard side shall keep out of the way of the other," was applied to the S., and the 18th rule (Id. 61), that, where "one of two ships is to keep out of the way, the other shall keep her course," was applied to the B.

2. The B. having changed her course, it was held that such change was made in the jaws of

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]
[2] [Modifying Case No. 12,332.]

peril, and was justified by the circumstances, and tended, in some slight degree, to increase the chances of escape.

[Cited in The Athabasca, 45 Fed. 656.]

3. The presumption of fault, under the 14th rule, was *held* to be against the S., throwing the burthen on her of excusing herself for the collision.

4. It was *held*, that the S. was in fault, in not making seasonable and correct observation of the situation of the B., in not properly observing her approach, in changing to a course which promoted danger, when proper attention would have so informed her, and in not slowing, stopping and backing when the danger became obvious.

5. It was *held*, that the B., also, was in fault, in not having her green light so screened that it could not be seen across her port bow, it having been so seen by the S. as to mislead the S.; and in not slowing, stopping and backing.

6. In a court of admiralty, a disregard of the rules of navigation. by one vessel, cannot be justified. on the mere ground, that, if the other vessel. also, had not violated her duty, no harm would have resulted.

7. The rule in regard to setting and screening colored lights must be strictly observed.

8. The B. and her cargo having been lost by the collision, and the S. damaged, and the owner of the S. having sued the owner of the B., and the owner of the B. having sued the S., and the owner of the cargo on the B. having sued, in one suit, both the S. and the owner of the B., the decree was. that both the B. and the S. must contribute to the whole loss; that, if, on ascertaining the whole loss, the contribution due from the S., to the fund, over and above her own loss, should be sufficient to indemnify the owner of the cargo on the B., it should be applied to that purpose; and that, if not, the parties would be heard, on the question as to by whom, if by any one, the deficiency should be made good.

[Appeal from the district court of the United States for the Eastern district of New York.

[These were libels by the North American Steamship Company against Jacob Lorillard, and by Edward Murphy against the Santiago de Cuba and Jacob Lorillard, to recover damages for collision.]

John E. Parsons, for owner of the Brunette.

Thomas E. Stillman, for the Santiago de Cuba and her owners.

Charles Donohue, for owner of the cargo of the Brunette.

WOODRUFF, Circuit Judge. The appeal, in these cases, is by the owners and the mortgagee of the steamship Santiago de Cuba, which was held, in the district court [Case No. 12,332], to be the guilty cause of a collision with the steamer Brunette, on the night of the 1st of February, 1870, at about ten o'clock. The Brunette and her cargo were totally lost. The owners of the Brunette libelled the Santiago de Cuba, the owners of the latter vessel sued the owner of the Brunette, and the owner of the cargo of the Brunette sued. in one suit, the Santiago de Cuba and the owner of the Brunette.

Certain facts, either alleged and not denied, or proved without material contradiction, may be stated as a basis of the inquiries by which these cases are to be decided. The Brunette was on her passage from New York to Philadelphia, and was pursuing her course south half west, at a speed not less than nine, and not exceeding ten, miles an hour, about four miles off the coast of New Jersey, near, or opposite, Squam Inlet. The Santiago de Cuba was on her passage from Havre to New York, and was pursuing a course northwest by north, at a speed of about six miles an hour, (described by the witnesses as half speed.) The Brunette saw the Santiago de Cuba off her port bow. The Santiago de Cuba saw the Brunette off her starboard bow. It is obvious that the courses of the two vessels must cross each other at some point either ahead or astern of the Brunette. The fact of a collision occurring some time after the vessels came within sight, makes it certain, that the point of intersection of the two courses was ahead of the Brunette. A collision occurred. The Santiago de Cuba struck the Brunette near midships, and the injury to her was so great that she sank, with her cargo, and two of her seamen were lost. No change was made in the course of either vessel, which affects the statement thus far made, and neither vessel slowed or slackened speed. They came together with full headway on: but, the blow given by the Santiago de Cuba was nearly direct, (at right angles to the keel of the Brunette,) inclining, however, about one point forward or towards her bow. The inclination of the blow shows, and the proofs also establish, that, before the collision, the Santiago de Cuba had changed her course to the westward; and the proofs also show, that the Brunette had sheered slightly to the west. The proofs are conceded, by the counsel for the appellants, to show, that, at the moment of collision, the Santiago de Cuba was headed west by north, and the Brunette south southwest.

It follows, from this statement, that the Santiago de Cuba, being on a course which crossed the course of the Brunette ahead of the latter, and having the Brunette on her starboard side, was within the fourteenth of the rules of navigation prescribed by congress (Act April 29, 1864; 13 Stat. 58), and was bound to keep out of the way of the latter vessel; and that the Brunette was, by the eighteenth of the said rules, bound to keep her course. The Brunette observed this latter rule, until the peril became imminent. I think it clearly established, that it was not until the collision became, in a very high degree, probable, that she ported her helm and sheered a point and a half to starboard. It was a struggle to escape, made at the last moment, and when she saw that the Santiago de Cuba, whose duty it was to avoid her, and whom she was bound to leave at liberty to avoid her, unembarrassed by any movement on her part, had failed to do so, and collision was impending. It is true that one witness

(Ross) expresses the opinion, that, if she had not ported, the collision would not have happened; but, apart from the qualification of his testimony, due to various circumstances impairing confidence therein, I deem the position, course and speed of the vessels, at that moment, to show, that it was a measure adopted when "in the jaws of the peril," justified by the circumstances, and tending, in some slight degree, to increase the chances of escape. At the most, it could only be an error of judgment, in a moment of great danger; and, if that danger was not caused by her fault, to show, she is not prejudiced thereby, unless her duty to slow, stop and reverse had become apparent, at a moment when it might have been useful, which will be hereinafter adverted to.

The Santiago de Cuba was, therefore, under the full pressure of the rule which required her to keep out of the way of the Brunette, and the Brunette was not bound to depart from her course. Indeed, if she had done so, and a collision had ensued, it would have been imputed to her as a fault. The Santiago de Cuba could have successfully claimed, that she had her choice of means of avoiding collision, and that the means chosen were thwarted by the Brunette's failure to keep her course, as required by rule 18, before referred to. Why, then, did not the Santiago de Cuba avoid the Brunette? The rule required her to do so, and she did not. The actual position and course of the vessels required her to do so, and yet she did the contrary. The presumption of fault is against her. The Brunette may properly rest on the actual position and course of the vessels. The burthen is, therefore, on the Santiago de Cuba, of excusing herself from actual conformity with the rule. She, prima facie, took the hazard of the success of any effort she made to avoid collision. She knew that she had the Brunette on her starboard side. All her witnesses agree in this. If she knew, or had reason to believe, that her course crossed the course of the Brunette, as, in fact, it did, then she can have no sufficient excuse. Her responsibility and duty were complete and final. In that condition of things, all the proofs, and all the arguments of counsel, addressed to the questions, how long before the collision the master and crew of the Brunette saw the Santiago de Cuba, whether their lookout was diligent, and the like, are not important, so long as it appears that the Santiago de Cuba was seen in sufficient season for any manœuvres which it was the duty of the Brunette to make, and that she kept her course until the danger was imminent, and then only departed slightly, in the vain hope of averting the consequences of the near approach of the other vessel.

The pressure of the duty to keep out of the way is felt by the owners and claimants of the Santiago de Cuba. A view of the actual course and position of the two vessels makes it so plain that the admitted starboarding of

her helm, and falling off of her course, to the westward, was the cause of the collision, that there is, to my mind, no alternative but to say, that, unless her navigators, notwithstanding the exercise of reasonable vigilance and skill were deceived respecting the course of the Brunette, she is wholly undefended and indefensible.

It is not a little remarkable, that, in this case, the parties, libellants and claimants, and the witnesses on behalf of each, give such a statement of the position and course of the vessels, when sighted, as, if true, makes it certain, that, if each vessel had kept its course, no collision could have occurred. Thus from the Brunette, the libel of her owner, and her witnesses, say, that, while she was on her course south half west, at a speed of nine miles an hour, she saw the Santiago de Cuba three miles distant, three points on her port bow. The course of the Santiago de Cuba was northwest by north, and her speed six miles an hour. If this be true, then, had each vessel kept her course, the Brunette would have passed the point of intersection of the courses long before the Santiago de Cuba could have reached it. The Brunette, going at much the greatest speed, had less than one-fifth of the distance to go which the Santiago de Cuba must traverse, to reach that point. And, no small allowance from precise accuracy of statement (due to imperfect observation) will change this result. It is, however, quite pertinent to observe, that, assuming the proximate accuracy of the statement in the libel, and of the witnesses from the Brunette, the actual manœuvres of the Santiago de Cuba, proved by her own witnesses, would bring the vessels into collision as they in fact collided. On the other hand, from the Santiago de Cuba, the answers, and the libel of her owners, and her witnesses, state, that, while she was on her course northwest by north, at a speed of six miles an hour, she saw the Brunette, then distant about three miles, three to four points on her starboard bow. The actual course of the Brunette was south half west, and her speed nine miles an hour. Now, if this be true, it is perfectly certain, that, had each vessel kept her course, the Santiago de Cuba would have crossed the course of the Brunette, passing the point of intersection long before the Brunette could have reached it. For, in such case, the Santiago de Cuba had less than one-fifth the distance to go which the Brunette must traverse to reach that point. Nor, in reference to either of these statements, is the distance given, three miles, very material, for, in each case, whether the distance apart be greater or less, the relative distances of the vessels from the point of intersection would be in the same proportion to each other.

This, however, is not the only criticism due to the statements made on behalf of the Santiago de Cuba. If the facts had been as set up in the libel and answers on her behalf, and as testified in her favor, that is to say,

if, running, at a speed of six miles an hour, on a course northwest by north, she saw the Brunette three or four points off her starboard bow, (which would be due north, or north by east, of her,) the Brunette being on a course south half west, at a speed of nine miles an hour, it would have been impossible to bring the vessels into collision by changes of course which headed the two vessels in the directions in which they are conceded to have been at the moment when they collided, without imputing to the Brunette an earlier change of course than can be reconciled with the testimony.

What, then, is the excuse of the Santiago de Cuba for not avoiding the Brunette? Obviously, the excuse must be one which justifies her in starboarding her helm, and falling off to the westward, into the track of the Brunette; and the excuse alleged is, that, when she saw the Brunette, she saw her white and green lights, and those only. This indicated that the latter was passing her on her starboard; that each, therefore, had the other on her own starboard; that this was a position and course of entire safety; that each might, therefore, keep her course, without any reason to apprehend collision, for, in this relation of the vessels to each other, their courses could not cross; that, with green light to green light, no precautions were necessary; and that, with those appearances before them, the starboarding and falling off to the west was giving the Brunette a wider berth, not, indeed, called for, but in no wise objectionable, while, on the other hand, under those circumstances, to port and go to the eastward would have been palpably wrong, a plain running after the Brunette, an attempt to reach her course when entirely away therefrom, and in no danger of meeting her, a clear departure from safety, and a seeking of peril. If there was no other fact than what is contained in this alleged excuse, bearing on the movements of the Santiago de Cuba, it would be difficult to say that she would not have been justified in either keeping her course or falling off to the westward; but, other facts must be brought into view, before we pronounce her excuse sufficient.

First, it is to be observed, that the appearances testified to, and which are claimed to have misled her, assume that the red light of the Brunette was not visible from the Santiago de Cuba, for, if it was, the indication was that they were approaching end on or nearly so, and the Santiago de Cuba should have ported and gone to the right. Next, they assume that the green light of the Brunette was seen across her own port bow, which was, on her part, a violation of the rule respecting the setting and screening of lights. Let this be assumed, and test its proper influence on the navigation of the Santiago de Cuba, when the actual position, course and speed of the Brunette are brought into connection therewith; and, in order to give the Santiago de Cuba the full benefit of

her claim, let it be granted, (contrary to the conclusion of the court below,) that she actually saw the Brunette's green light three or four points on her port bow, three miles distant, as her witnesses testify. What must inevitably be the result, if she observed it continuously, or even long enough to form any rational judgment? Herself going northwest by north, six miles an hour, the Brunette approaching on a course south half west, at nine miles an hour, that green light must and did close in rapidly on her bow. This is certain. Had the Brunette been, as those on the Santiago de Cuba profess to have at first supposed, and as the appearances indicated, passing to the eastward, that green light would have opened more and more, till it passed abeam. That is equally certain. Not the ten or more minutes they had the Brunette under view, but a much less number of minutes, would have taught them, that whatever bore that green light was approaching rapidly, and that they were crossing its course. In fact, it did close in upon their very bow before the collision, and yet they persisted in their turn or swing to the westward. According to their own account of the circumstances, they had abundance of time to discover, by the actual changes in the bearing of the lights, that they were running into danger. They are, therefore, reduced to this alternative—they did not keep a proper lookout, and see the Brunette so soon as they ought, (which was the conclusion of the court below); or, they suffered themselves to be too long misled by the appearance of the Brunette's green light, and failed to take the precautions which a proper observation of its approach, and its closing in upon their bow, would have suggested. But, what is, under these circumstances, especially plain, they wholly neglected the precaution which the sixteenth of the rules of navigation, as well as the dictates of ordinary prudence, required of them. That rule is peremptory, and cannot, I think, be too rigorously insisted upon, namely: "Every steamship, when approaching another ship, so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse." Now, however misled, in the first instance, by the green light of the Brunette, the testimony from the Santiago de Cuba shows, that she had time to observe, and did observe, the constant drawing nearer and nearer of the two. Whether the Brunette was or was not in fault, her changing bearings from the Santiago de Cuba certainly showed risk, and great risk, of collision; and yet the Santiago de Cuba made no effort whatever to slow, stop or back. The importance of this fault is intensified, when it is seen, that, in the actual position of the vessels, the Santiago de Cuba was coming upon the other, and that a retardation equivalent to a delay of less than ten seconds would have cleared her.

I cannot, upon all the evidence, resist the conclusion, that the Santiago de Cuba was in fault, first, in not making seasonable and cor-

rect observation of the situation of the Brunette, in not properly observing her approach, in continuing to fall off to the westward, when proper skill and attention would have taught her, although misled in the first instance, that that course was running into danger, and in not slowing, stopping and backing when the danger became clear and obvious. True, one of the witnesses in this court states, that a signal to stop was given; but, if he tells the truth, he concedes it was not until it was too late to be of any use, and the engineer testifies that he received no such signal before the blow.

It does not, however, follow, that the Santiago de Cuba is alone responsible for this collision. The proof seems to me to establish, that those in charge of the Santiago de Cuba were actually misled by the improper exhibition of the Brunette's green light; and, if so, then, although it be true that an attentive observation of its motion and its approach might have enabled the Santiago de Cuba to discover her error, yet this does not exonerate the Brunette, when it is shown that she led the other vessel into the error, and so invited the very manœuvres which proved so disastrous.

It should be borne in mind, that the rules of navigation, whether by statute or the law maritime, are founded in regard for property and life, and in that public policy which demands their protection; and that a disregard of those rules is not to be justified, or the proper penalty therefor evaded, on the mere ground, that, if the other party had not also failed in duty, no harm would have resulted. Hence, where there is concurring fault on both sides, both contributing to injury and loss, a court of admiralty visits the consequences upon both.

Is it, then, shown, that the lights of the Brunette were improperly set, and did that operate to mislead those who were in control of the Santiago de Cuba? The rule (article 3 of the act already cited) requires, that the lights, (both green and red,) "shall be so constructed as to throw an uniform and unbroken light over an arc of the horizon of ten points of the compass, so fixed as to throw the light from right ahead to two points abaft the beam. * * * The said green and red side lights shall be fitted with inboard screens, projecting at least three feet forward from the light, so as to prevent those lights from being seen across the bow." Here is no permission to allow the range of the two lights to cross at the bow, nor in fact to cross at all. In practice, it is, no doubt, true, at least, it is often so testified, that, at long distances ahead, both lights can be seen on a vessel approaching; but this rule recognizes no necessity for the crossing of the lights anywhere. It requires that each shall be so screened, that it can be seen only from right ahead, and that it cannot be seen across the bow. Here, the testimony of the owner of the Brunette, while it does not admit that the

range of the lights crossed at the bow, does concede that they crossed at some short distance ahead; but, the other witnesses from the Brunette warrant the inference that they did cross, so that a man standing forward, and inside the bow itself, could see both lights, by the mere turn of the head towards each, and their testimony is not inconsistent with the facts testified by the witnesses from the Santiago de Cuba on that subject; and, I may add, that the testimony of witnesses to what they actually saw, is, if they are credible, of more weight than the opinions or retrospective judgment of any witness. Five witnesses, the officer of the deck, the quartermaster at the wheel, the ship's carpenter, and two seamen on the lookout, all testify, unqualifiedly, to seeing the green light of the Brunette. Their reasoning on the subject, and conclusion that the approaching vessel would pass to their starboard, and their actual starboarding on and after seeing the green light, to give her a wider berth, tend to confirm their statement. I cannot conclude that they are, in this, all perjured witnesses, nor can they, I think, be mistaken. Their words and their acts concur herein; and the proofs from the Brunette itself make the truth of their statements not only possible but probable. If, now the testimony given in behalf of the Brunette, on her libel itself, be taken as true, in respect to the position and course of the vessels, it becomes certain, that the range of the Brunette's lights crossed her bows; and the obliquity was much greater than the recollection of her owner suggests. Thus, her libel states, and her witnesses testify, that the Santiago de Cuba was seen three points off their port bow. As already shown, in considering the faults of the Santiago de Cuba, that statement is not greatly erroneous; and yet, the green light of the Brunette was seen from the Santiago de Cuba then, or very soon after, and when the vessels were at a distance apart quite sufficient for any manœuvre which the appearances called for; and, influenced thereby, the Santiago de Cuba was turned, first slightly, to the westward, but for which the collision could not have occurred. The observations made in the case of The North Star [Case No. 10,331] are apt to this case, on that point. Indeed, on more than one point, the observations in that case have a significant bearing on the present.

This rule in regard to setting and screening the colored lights cannot be too highly valued, or the importance of its exact observance be overstated. Better far to have no side lights, than to have them so set and screened as to be seen across the bow. In that situation, they operate as a snare, to deceive even the wary into error and danger; and, in the present case, I confess, that, were it not very clear, that the Santiago de Cuba did not exercise all the diligence which was due, I must have held this the actual and sole cause of collision, subject only to such observations

on the duty to slow, stop and back as the circumstances called for. In this view, I do not stop to consider whether the Brunette's red light was hidden from view by the flow of her stay-sail, or whether it was or was not seen from the Santiago de Cuba till the instant before the collision. It is possible that it might have been so hidden; but, whether it was or not, I have, upon other grounds, held the Santiago de Cuba in fault, in not making more diligent and more accurate observation upon the position and course of the Brunette; and no determination of the question, whether the sail hid the red.light, will change the fact, that the green light was seen across her bows, and misled the officers of the Santiago de Cuba as to her course.

Nor am I satisfied that the Brunette, in not slowing, stopping and backing, was not herself in like fault with the Santiago de Cuba. If, instead of porting her wheel, when she saw the danger, she had done this, and, especially, if, besides and before porting, she had slowed, stopped and reversed, it is greatly probable that no collision would have happened. True, under the general rule, she was entitled to keep her course, but the time did come when she saw danger of collision, and when the rule, that "every steamship, when approaching another ship, so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse," became applicable to her, also. She did see the danger. She did port, in order to escape. If, in due season, she had slowed, stopped and reversed, it is hardly possible that the two would have collided. A delay equivalent to a few seconds would have permitted the Santiago de Cuba to go clear. As already observed, these rules are not framed as the mere rule of obligation between the two colliding vessels. They are not based upon the idea that one may say to the other—you are in fault, and I will, therefore, do as I will. The interests of human life and the protection of property demand, that, in circumstances of peril, the dictates of the highest prudence, and, especially all just and peremptory rules of precaution, shall be observed by both, and their disregard shall bring both under condemnation. Had the Brunette made even an ineffectual endeavor, it would have been credited to her, but. on the contrary, she rushed, without any effort to check her, full speed, upon the destruction which she encountered.

The decree, in each of the cases founded upon this collision, must proceed upon the basis of contribution, by both the Brunette and the Santiago de Cuba, to the whole loss. If, upon the ascertainment of the whole loss, the contribution due from the Santiago de Cuba, to the fund, over and above her own loss, shall be sufficient to indemnify the owner of the cargo of the Brunette, it shall be applied to that purpose. If not, then the owner of the cargo shall be at liberty, on the ascertainment of the fact. to apply to the court for further decree or direction, or, if counsel prefer, I will hear them further on the question, by whom, if by any one, the deficiency shall be made good.

---

SANTISSIMA TRINIDAD, The. See Case No. 2,568.

SANTISSIMA TRINIDAD, The (CANIZARES v.). See Case No. 2,383.

SANTOS (BOWDEN v.). See Case No. 1,716.

SANTOS (UNITED STATES v.). See Case No. 16,222.

SAPPHIRE, The (POPE v.). See Case No. 11,276.