**UNITED STATES of America, Plaintiff,**

v.

**KENNEBEC LOG DRIVING COMPANY, et al., Defendants.**

**Civ. No. 12–77.**

United States District Court, D. Maine, S. D.

March 7, 1973.

Peter Mills, U. S. Atty., John B. Wlodkowski, Asst. U. S. Atty., Portland, Maine, Thomas C. Lee and James R. Walpole, Land & Natural Resources Div., Dept. of Justice, Washington, D. C., Charles Corkin II, and William Luneburg, Environmental Protection Agency, Boston, Mass., for plaintiff.

Vincent L. McKusick, Peter L. Murray and Daniel E. Boxer, Portland, Maine, Loyall F. Sewall, Portland, Maine, Roberts B. Owen, Washington, D. C., Norman M. Heisman, W. T. Peabody and Ellis Horwitz, Philadelphia, Pa., for defendants.

## OPINION AND ORDER OF THE COURT

GIGNOUX, District Judge.

This is a suit by the United States under the Rivers and Harbors Act of 1899, as amended, 33 U.S.C. § 401 et seq., to enjoin defendant companies from engaging in any further log-driving activities on the upper reaches of the Kennebec River. The government charges (1) that the placing of logs into the river and the construction and maintenance of log-driving "booms" on the river, without the authorization of the Secretary of the Army, create obstructions to the navigable capacity of the Kennebec, in violation of Section 10 of the Act, 33 U.S.C. § 403, and (2) that the settling on the bottom of the river of water-soaked logs and of bark which has peeled from the logs in the course of the log drive, in the absence of a permit from the Secretary of the Army, constitutes an unlawful deposit of refuse matter into the Kennebec, in violation of Section 13 of the Act, 33 U.S.C. § 407. The parties have completed extensive discovery. Being in agreement that there is no genuine issue as to any material fact, both plaintiff and defendants have moved for summary judgment. Fed.R.Civ.P. 56(c).

Defendant Kennebec Log Driving Company is a "non-stock membership corporation," which has been engaged in the driving of logs on the upper Kennebec since 1835, when the Legislature of the State of Maine by a special statute authorized it and its member companies to use the Kennebec for transporting logs to their pulp mills further downstream. Private and Special Laws of Maine of 1829–35, ch. 590 (1835). Throughout the nineteenth century the Kennebec Company drove logs for a substantial number of member companies (37 in 1893), but by 1972 defendant Scott Paper Company and Statler Tissue Corporation were the only active members.[1] The volume of logs driven each year, however, has remained relatively constant, fluctuating only with general business conditions.

The methods by which the logs are driven has also remained largely un-

---

1. Defendant Hudson Pulp and Paper Corp., while still technically a member of the Kennebec Company, is no longer placing logs in the annual drive because it no longer operates a pulp mill in Maine.

changed. The traditional river drive, of which the Kennebec drive is typical, has used the following procedures.[2] The cut pulpwood[3] is brought to the river bank and deposited in the river to commence its trip to the mill. Where the current of the river is swift enough to carry the loose logs downstream, they are allowed to be so carried. "Booms" (usually strings of logs fastened together by chains) are used to guide the logs past inlets and other obstacles in order to keep them in the main channel of the river. When the logs reach the heads of lakes formed by dams along the river, they are held for varying periods behind more elaborate booms strung across the lakes. As conditions permit, the logs are then gathered into "rafts" and towed by small boats across the lakes to the dams, where the logs are fed into sluiceways over the dams.[4] Finally, when the logs reach the mill for which they are destined, they are guided by booms toward the shore, removed from the river, and processed for the manufacture of paper. Every log drive, including the Kennebec log drive, necessarily involves some sloughing off of bark into the river and the sinking of logs which have become waterlogged. Although the precise figures are in dispute, a not insignificant quantity of bark and waterlogged logs thus settles to the bottom of the Kennebec.[5]

Although log driving on the upper reaches of the Kennebec, as on rivers all over the country, has been going on for nearly a century and a half, only recently has it become a matter of public concern, mainly in regard to its ecological impact. This concern has been voiced both in Maine and nationally. In May 1971 the Maine Legislature passed a law declaring that log driving on all Maine rivers must end by October 1, 1976, 38 M.R.S.A. § 418; but even prior to the enactment of this legislation, and well before the present suit was filed, defendant Scott had publicly announced that the Kennebec log drive would come to an end no later than October 1, 1976, an action of which both houses of the Maine Legislature expressed their appreciation in a joint order. H.P. 795, 1 Maine Leg.Rec. 470 (1971). In addition, on the national level, subsequent to the institution of this action, Congress has passed the extensive Federal Water Pollution Control Act Amendments of 1972, Pub.L. No. 92–500 (Oct. 18, 1972), 86 Stat. 816 et seq., supplementing the Federal Water Pollution Control Act of 1970, 33 U.S.C. § 1151 et seq. Counsel agree, however, that these amendments have no direct bearing on the instant suit. *See* Pub.L. No. 92–500, *supra*, § 4(a), 86 Stat. 896; 118 Cong.Rec. S16882–83, H9123 (daily ed. Oct. 4, 1972); United States v. Consolidation Coal Company, 354 F.Supp. 173 (N.D. W.Va., 1973).

Four sections of the Rivers and Harbors Act are relevant to this case:

(1) Section 10 of the Act, 33 U.S.C. § 403, prohibits: (1) "the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States," and (2) "the building of any . . . boom . . . or other structures in any . . . navigable river, or other water of the United

---

2. For an authoritative description of the traditional log drive both parties refer to a recognized early treatise, Bryant, Logging: The Principles and General Methods of Operation in the United States (2d ed. 1923).

3. "Long logs" have not been included in the Kennebec drive since 1939.

4. On the upper Kennebec, the towing process occurs at three points: at Moose-head Lake (the headwaters of the Kennebec), at Indian Pond (the next lake downstream), and at Wyman Lake (the last lake on the river).

5. Scott estimates that, over the years, 1.98% of the pulpwood it has placed in the river has sunk. The government believes this figure is underestimated.

States . . . except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army . . . ." [6]

(2) Section 13 of the Act, 33 U.S.C. § 407, makes it unlawful to deposit in navigable waters "any refuse matter of any kind or description whatever" (other than liquid sewage), except in accordance with a permit from the Secretary of the Army. [7]

(3) Section 15 of the Act, 33 U.S.C. § 409, makes it unlawful "to float loose timber and logs, or to float what is known as 'sack rafts of timber and logs' in streams or channels actually navigated by steamboats in such manner as to obstruct, impede, or endanger navigation. . . ." [8]

6. Section 10 provides in full:

*Obstruction of navigable waters generally; wharves; piers, etc.; excavations and filling in*

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor or refuge or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

7. Section 13 provides in full:

*Deposit of refuse in navigable waters generally*

It shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or deposited either from or out of any ship, barge, or other floating craft of any kind, or from the shore, wharf, manufacturing establishment, or mill of any kind, any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state, into any navigable water of the United States, or into any tributary of any navigable water from which the same shall float or be washed into such navigable water; and it shall not be lawful to deposit, or cause, suffer, or procure to be deposited material of any kind in any place on the bank of any navigable water, or on the bank of any tributary of any navigable water, where the same shall be liable to be washed into such navigable water, either by ordinary or high tides, or by storms or floods, or otherwise, whereby navigation shall or may be impeded or obstructed: *Provided*, That nothing herein contained shall extend to, apply to, or prohibit the operations in connection with the improvement of navigable waters or construction of public works, considered necessary and proper by the United States officers supervising such improvement or public work: *And provided further*, That the Secretary of the Army, whenever in the judgment of the Chief of Engineers anchorage and navigation will not be injured thereby, may permit the deposit of any material above mentioned in navigable waters, within limits to be defined and under conditions to be prescribed by him, provided application is made to him prior to depositing such material; and whenever any permit is so granted the conditions thereof shall be strictly complied with, and any violation thereof shall be unlawful.

8. Section 15 provides in full:

*Obstruction of navigable waters by vessels; floating timber; marking and removal of sunken vessels*

It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft; or to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels; or to float loose timber and logs, or to float what is known as "sack rafts of timber and logs" in streams or channels actually navigated by steamboats in such manner as to obstruct, impede, or endanger navigation.

(4) The Act of May 9, 1900, 31 Stat. 172, now codified as 33 U.S.C. § 410, provides in part: [9]

The prohibition contained in Section 409 of this title against floating loose timber and logs, or sack rafts, so called, of timber and logs in streams or channels actually navigated by steamboats, shall not apply to any navigable river or waterway of the United States or any part thereof whereon the floating of loose timber and logs and sack rafts of timber and logs is the principal method of navigation. But such method of navigation on such river or waterway or part thereof shall be subject to the rules and regulations prescribed by the Secretary of the Army as provided in this section.

The Secretary of the Army shall have power, and he is authorized and directed to prescribe rules and regulations, which he may at any time modify, to govern and regulate the floating of loose timber and logs, and sack rafts, (so called) of timber and logs and other methods of navigation on the streams and waterways, or any thereof, of the character, as to navigation, heretofore in this section described. The said rules and regula-

And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as provided for in sections 411 to 416, 418, and 502 of this title.

9. 33 U.S.C. § 410 provides in full:
*Exception as to floating loose timber, sack rafts, etc.; violation of regulations; penalty*

The prohibition contained in section 409 of this title against floating loose timber and logs, or sack rafts, so called, of timber and logs in streams or channels actually navigated by steamboats, shall not apply to any navigable river or waterway of the United States or any part thereof whereon the floating of loose timber and logs and sack rafts of timber and logs is the principal method of navigation. But such method of navigation on such river or waterway or part thereof shall be subject to the rules and regulations prescribed by the Secretary of the Army as provided in this section.

The Secretary of the Army shall have power, and he is authorized and directed to prescribe rules and regulations, which he may at any time modify, to govern and regulate the floating of loose timber and logs, and sack rafts, (so called) of timber and logs and other methods of navigation on the streams and waterways, or any thereof, of the character, as to navigation, heretofore in this section described. The said rules and regulations shall be so framed as to equitably adjust conflicting interests between the different methods or forms of navigation; and the said rules and regulations shall be published at least once in such newspaper or newspapers of general circulation as in the opinion of the Secretary of the Army shall be best adapted to give notice of said rules and regulations to persons affected thereby and locally interested therein. And all modifications of said rules and regulations shall be similarly published. And such rules and regulations when so prescribed and published as to any such stream or waterway shall have the force of law, and any violation thereof shall be a misdemeanor, and every person convicted of such violation shall be punished by a fine of not exceeding $2,500 nor less than $500, or by imprisonment (in case of a natural person) for not less than thirty days nor more than one year, or by both such fine and imprisonment, in the discretion of the court: *Provided*, That the proper action to enforce the provisions of this section may be commenced before any commissioner, judge, or court of the United States, and such commissioner, judge, or court shall proceed in respect thereto as authorized by law in the case of crimes or misdemeanors committed against the United States.

The right to alter, amend, or repeal this section at any time is reserved.

tions shall be so framed as to equitably adjust conflicting interests between different methods or forms of navigation . . . .

Defendants concede that the upper Kennebec is a navigable water of the United States and that the Rivers and Harbors Act is as applicable. to the Kennebec as it is to any other navigable river, *cf.* Central Maine Power Co. v. F.P. C., 345 F.2d 875 (1st Cir. 1965); Wisconsin Public Service Corp. v. F.P.C., 147 F.2d 743 (7th Cir.), cert. denied, 325 U.S. 880, 65 S.Ct. 1574, 89 L.Ed. 1996 (1945). Defendants also concede that they have not applied for or obtained any permit or authorization from the Secretary of the Army under Section 10 or 13 to conduct their log-driving activities. The government concedes that log driving has always been the principal method of navigation on the upper Kennebec.[10] The parties further agree that the Secretary of the Army has never issued any rule or regulation governing log driving on the Kennebec.

The government contends that the logs and booms placed by defendants in the river create obstructions to navigation in violation of Section 10 of the Act, and that the settling of bark and water-soaked logs on the bottom of the river constitutes the unlawful deposit of refuse matter in violation of Section 13. Defendants' basic position [11] is that Sections 10 and 13 of the Act are not applicable to their log-driving operations in light of the specific language of Section 410. The Court agrees with defendants that the structure of the Act, and the legislative and administrative history of Section 410, make clear the intent of Congress in enacting Section 410 to exclude traditional log-driving activities on rivers such as the Kennebec from the prohibitory language of Sections 10 and 13.

Defendants do not seriously contest the facial applicability of Sections 10 and 13 to their activities.[12] Indeed, it can no longer be doubted that the loose logs and booms in the river create an "obstruction" within the meaning of Section 10, or that the peeled bark and sunken logs on the river bottom are deposits of "refuse matter" within the meaning of Section 13. See United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960); United States v. Standard Oil Co., 384 U.S. 224, 86 S.Ct. 1427, 16 L. Ed.2d 492 (1966); United States v. Maplewood Poultry Co., 327 F.Supp. 686 (D.Me.1971). But when the Act as amended is read as a whole, it is plain that the provisions of Section 410, which deal specifically with log drives, and not the general prohibitions of Sections 10 and 13, control this suit.

The government's theory of this case depends entirely upon the breadth of the statutory language of Sections 10 and 13 prohibiting "any obstruction," including "any . . . boom," and "any refuse matter," without prior authorization by the Secretary of the Army. The general prohibitions of Sections 10 and 13, however, cannot be read in isolation from the Act as a whole. "Statutory interpretation requires more than concentration upon isolated words; rather, consideration must be given to the total corpus of pertinent law and the policies that inspired ostensibly inconsistent provisions." Boys Market v. Retail Clerks Local 770, 398 U.S. 235, 250, 90 S.Ct.

---

10. Indeed, so far as the record discloses, it appears that, other than occasional recreational boating, log driving is the only form of navigation that has ever occurred on the upper Kennebec.

11. In light of the Court's disposition of the action, it does not reach defendants' alternate contention that in any event the type of log-driving operations being conducted by them on the Kennebec does not fall within the prohibitions of Sections 10 and 13.

12. Defendants do argue, however, that their log-driving activities do not in fact violate Sections 10 and 13, a contention the Court does not find it necessary to reach. *See* n. 11, *supra.*

1583, 1592, 26 L.Ed.2d 199 (1970). See also Richards v. United States, 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 285, 76 S.Ct. 349, 100 L. Ed. 309 (1956). The 1899 Act, as originally enacted, in addition to the general provisions of Sections 10 and 13 concerning obstructions to navigation and deposits of refuse matter, dealt specifically with log driving. Section 15 of the Act prohibited log driving which might interfere with navigation on any river actually navigated by steamboats.[13] In an evident effort to establish a rational balance between the substantially incompatible interests of steamboating and log driving on the nation's rivers, Section 15 thus gave priority to steamboat traffic wherever a conflict might exist. The following year, apparently dissatisfied with the balance it had struck, Congress retreated from the one-sided approach of Section 15. By the Act of May 9, 1900, now 33 U.S.C. § 410, Congress explicitly authorized [14] log drives on rivers, such as the upper Kennebec, where log drives are the principal method of navigation, subject only to regulation by the Secretary of War (now the Secretary of the Army), who was to "equitably adjust conflicting interests between the different methods or forms of navigation." Thus, at least with respect to rivers where log driving was the principal form of navigation, Congress settled on a regulatory rather than a prohibitive approach. In doing so, the only reasonable conclusion is that Congress superseded Sections 10 and 13 insofar as they might otherwise apply to log drives on such rivers. Under established principles of statutory construction, "however inclusive may be the general language of a statute, it 'will not be held to apply to a matter specifically dealt with in another part of the same enactment. . . . Specific terms prevail over the general in the same or another statute which otherwise might be controlling,' Ginsberg & Sons v. Popkin, 285 U.S. 204, 208 [52 S.Ct. 322, 76 L.Ed. 704]" (1932). MacEvoy Co. v. United States, 322 U.S. 102, 107, 64 S.Ct. 890, 894, 88 L. Ed. 1163 (1944), quoted in Fourco Glass Co. v. Transmirra Prods. Corp., 353 U.S. 222, 228–229, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957).

There can be no question that to the extent Section 410 authorizes log drives as such, it necessarily must authorize the booms, which have always been a necessary part of log driving, and the sloughing off of bark and the sinking of logs, which such drives inevitably entail. As the legislative history, discussed *infra*, demonstrates, when Congress enacted Section 410 in 1900, it not only knew that the use of booms was an essential part of the log drives it was authorizing but it actually had booms in mind when it wrote the provision. Furthermore, given Congress' contemporaneous knowledge of log-driving methods, also evident from the legislative history, it must have known that sloughage of bark and sunken logs were inherent in the floating of logs in water. To say that Section 410 authorizes log driving on the rivers involved, but that Sections 10 and 13 simultaneously prohibit the inherent characteristics of a log drive, is to attribute to Congress an intent to legalize log driving and at the same time to prohibit its unavoidable side effects.[15] If

---

13. As a corollary, it would appear that Section 15 by implication authorized log driving on rivers where steamboats did not operate.

14. The government argues that in effecting a limited removal of the prior ban on log driving, Congress was creating only a "partial exemption" to the prohibition and was not "authorizing" anything. But the statute does do more than merely lift a prohibition, in that it goes on to provide that "such method of navigation [i. e., log driving] . . . shall be subject to the rules and regulations prescribed by the Secretary of the Army . . . ." This surely indicates that Congress contemplated that log driving, under proper regulation, would occur on the specified rivers.

15. The government offers no alternative theory of what Congress intended to accomplish by enacting Section 410, or of

the government's position were to be adopted, the result would be to read Section 410 out of the Act. There is absolutely no legislative, administrative or judicial authority to support such a reading.

The legislative history of Section 410 confirms that Congress intended to authorize log drives and their necessary incidents on rivers such as the Kennebec, subject only to regulation by the Secretary of War. It also shows that Congress was aware in 1900 that the use of booms was an intrinsic ingredient of a log drive.

Research has disclosed no presently meaningful legislative history of Sections 10, 13 and 15, the portions of the 1899 Act relevant to this case.[16] But the reaction to Section 15's outright prohibition against floating logs on rivers navigated by steamboats was immediate. In the first days of the next session of Congress a bill was introduced in the House of Representatives to remove the prohibition against floating logs from Section 15. 33 Cong.Rec. 840 (Jan. 15, 1900) (H.R. 6249). The Committee on Rivers and Harbors, to which the bill was referred, reported back a substitute bill which exempted the upper Mississippi River "above the St. Paul Boom" and certain of its tributaries from Section 15, and provided for the regulation of log drives on such rivers by the Secretary of War. 33 Cong.Rec. 3108 (Mar. 20, 1900) (H.R. 9824). The Committee Report described the conduct of log drives on the named rivers, specifically referring to the use of booms, and pointed out the inevitable obstruction to steamboat navigation ˏwhich resulted. H.R.Rep. No. 731, 56 Cong., 1st Sess. 3 (1900). Nevertheless, the Committee recommended adoption of the bill to "provide that upon such streams this

navigation by logs . . . shall be conducted under such regulations as the Secretary of War may from time to time make." *Id*. at 4. The House of Representatives passed the bill on the basis of the Committee chairman's characterization that it "provide[d] for *an exception to the general law* in the regulations for the rivers included." 33 Cong.Rec. 3233 (Mar. 23, 1900) (emphasis added).

When the bill reached the Senate, the Committee on Commerce broadened the House bill to provide that the Secretary of War might issue regulations for *any* river "whenever in his judgment such regulations are necessary to equitably adjust and govern the conflicting interests of logging and other forms of navigation." 33 Cong.Rec. 4405 (Apr. 19, 1900) (H.R. 9824 reported); Sen.Rep. No. 1035, 56 Cong., 1st Sess. (1900). The Senate passed the amended bill without debate. 33 Cong.Rec. 4586 (Apr. 24, 1900).

The Conference Committee struck the eventual compromise which became Section 410. The House Conferees explained the final bill as follows:

> The bill as it passed the House made provision only for certain rivers and portions of rivers in the states of Minnesota and Wisconsin, in which the floating of logs and sack rafts was the predominate form of navigation . . . . After the bill passed the House it developed that similar conditions prevailed upon other waterways in different portions of the country. . . . This led the Senate to amend the bill quite materially, so as to provide that regulations might be made available for the extension of *this exemption* to all navigable rivers or waterways of the United States.

how Section 410 could have any effect except by reducing the reach of Sections 10 and 13.

16. As the Supreme Court has observed, the 1899 Act was a codification of existing

laws relating to navigable waters and contained no substantive changes. United States v. Republic Steel Corp., *supra*, 362 U.S. at 486, 80 S.Ct. 884; United States v. Standard Oil Co., *supra*, 384 U.S. at 226–228, 86 S.Ct. 1427.

In conference it did not seem best to so enlarge the scope of the original bill, *and it was agreed that the floating of logs, sack rafts, and timber should be allowed,* under proper regulations, in waterways where the floating of timber is the principal method of navigation. . . . 33 Cong.Rec. 4870 (Apr. 30, 1900) (emphasis added).

It was made explicit by the Conferees that the objective of the legislation was *"exempting* . . . the floating of logs and sack rafts [in the rivers involved] *from the prohibitions included in the last river and harbor Act." Idem.* (emphasis added).

The legislative history of Section 410 thus clearly demonstrates that Congress intended, in the balance finally struck, to authorize log driving, with its necessary incidents, on rivers principally used for log driving, subject only to regulation by the Secretary of War.

■ This conclusion as to the intent of Congress in enacting Section 410 is buttressed by the long-standing administrative construction of the statute by the officials charged with its administration. The Secretary of War quickly and unambiguously interpreted Section 410 as superseding the 1899 Act. In his 1900 Annual Report he described Section 410 as removing a large number of rivers from the operation of the 1899 Act:

A large number of rivers is included in the class *excepted from the law of 1899,* and different regulations based upon the varying conditions, will be required for each river. Detailed investigation will be necessary to determine the condition in each case and to insure as nearly as possible an equitable adjustment of conflicting interests, as required by the new law. Annual Reports of the War Department, Report of the Chief of Engineers, H.R.Doc. No. 2, vol. II, pt. 1, 56th Cong., 1st Sess. 44 (1900) (emphasis added).

Immediately thereafter, the Secretary, acting under the authority of Section 410, began issuing regulations for several rivers, *idem.,* and he has continued to issue such regulations, many of which are still in the Code.[17] These regulations specify in detail when and in what manner log driving, including the use of booms, is to be permitted on the rivers involved. In contrast to the contemporaneous and consistent pattern of regulating log driving and booms under Section 410, the Secretary has never issued any regulations or granted any permits relating to log driving under Section 10 or 13.[18] The argument is persuasive that

---

17. *See, e. g.,* 33 C.F.R. §§ 207.290 (Current River, Mo.) (Mar. 2, 1916), 207.350 (St. Croix River, Wisc. and Minn.) (Apr. 20, 1907), 207.380 (Red Lake River, Minn.) (Feb. 24, 1905), 207.490 (Cheboygan River, Mich.) (July 11, 1903), 207.-770 (Snoqualmie and Snohomish Rivers, Wash.) (Apr. 27, 1910).

As previously noted, the Secretary has never issued any regulation regulating log driving on the Kennebec, presumably because of the absence of steamboating on the upper reaches of the river where the log drive is conducted.

18. In response to defendant Scott's interrogatories, the government has listed 12 regulations purportedly issued pursuant to Section 10 or 13 regulating the use of booms in connection with log drives.

Eleven of these, however, were in fact issued pursuant to Section 410, Annual Reports of the War Department, Report of the Chief of Engineers, pt. 1, H.R.Doc.No. 2, vol. V, 58th Cong., 3rd Sess. 710–11 (1904) (33 C.F.R. §§ 207.350, 207.370, 207.380, 207.660 (1972)); Annual Reports of the War Department, Report of the Chief of Engineers, pt. 1, H.R.Doc. No.2, vol. V, 59th Cong., 1st Sess. 719 (1905) (33 C.F.R. § 207.360 (1972)); Annual Reports of the War Department, vol. II, Report of the Chief of Engineers, H.R.Doc., 61st Cong., 3rd Sess. 1019 (1910) (33 C.F.R. § 207.780 (1972)); Annual Reports of the War Department, vol. II, Report of the Chief of Engineers, 1621 (1915) (33 C.F.R. § 207.330 (1972)); Annual Reports of the War Department, vol. II, Report of the Chief

he has not done so because he has always interpreted Section 410 as superseding Sections 10 and 13 to the extent the latter sections would otherwise be applicable to log-driving activities on these rivers. The actions of the Secretary in administering the 1899 Act and its 1900 amendment thus show that the government officials charged with implementing the statute have consistently considered that Section 410, and not Sections 10 and 13, governs the conduct of log drives on rivers such as the upper Kennebec where "the floating of loose timber and logs . . . is the principal method of navigation." [19] It is, of course, an established principle that the construction of a statute by those charged with its implementation, while not conclusive, is entitled to "great weight" in construing the Act. United States v. Republic Steel Corp., *supra,* 362 U.S. at 490 n. 5, 80 S.Ct. 884, 4 L. Ed.2d 903. *See also, e. g.,* Griggs v. Duke Power Co., 401 U.S. 424, 433-434, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); United States v. City of Chicago, 400 U. S. 8, 10, 91 S.Ct. 18, 27 L.Ed.2d 9 (1970); Lewis v. Martin, 397 U.S. 552, 559, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970); Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L. Ed.2d 616 (1965).

Finally, the Court is not aware of any reported judicial decision discussing the applicability of Sections 10 and 13 of the 1899 Act to log driving. The government cites two cases in which Section 10 of the Rivers and Harbors Act of 1890, 26 Stat. 426, 454 (the predecessor of Section 10 of the 1899 Act) was applied to booms. But United States v. Bellingham Bay Boom Co., 176 U.S. 211, 20 S.Ct. 343, 44 L.Ed. 437 (1900), was decided before Section 410 was enacted. And while United States v. Wishkah Boom Co., 136 F. 42 (9th Cir. 1905) was decided after enactment of Section 410, there is no indication that the Court considered that provision. The case merely held that the 1890 statute was applicable to the boom in question.

■ Based upon the undisputed facts appearing in the record, the Court holds that Sections 10 and 13 of the Rivers and Harbors Act of 1899, as amended, do not apply to defendants' log-driving activities on the Kennebec River, in the face of the provisions of 33 U.S.C. § 410, which deal specifically with log drives on rivers on which log driving is the principal method of navigation. Since the present action is grounded solely upon alleged violations of Sections 10 and 13, plaintiff's motion for summary judgment is denied, and defendants' motions for summary judgment are granted. Judgment will be entered accordingly.

It is so ordered.

of Engineers, 1878 (1918) (33 C.F.R. § 207.270 (1972)); Annual Reports of the War Department, Report of the Chief of Engineers, pt. 1, 2001 (1921) (33 C.F.R. § 207.730 (1972)); Annual Reports of the War Department, Report of the Chief of Engineers, pt. 1, 2119 (1922) (33 C.F.R. § 207.720 (1972)); 12 Fed. Reg. 2602 (1947) (33 C.F.R. § 207.663 (1972)). The remaining regulation was issued under the general rule-making authority of 33 U.S.C. § 1, 24 Fed.Reg. 3629 (1959) (33 C.F.R. § 207.655 (1972)). The current Code of Federal Regulations cites 33 U.S.C. § 1 as authority for all navigation regulations. *See* 33 C.F.R. Part 207 at 127 (1972).

19. It would appear that the Department of Justice must also have long concurred with the Secretary's interpretation of the Act. Until the present suit was filed, the Attorney General has never invoked Sections 10 and 13 (either by filing enforcement suits or by bringing criminal charges) against log driving or its incidents on any river within the scope of Section 410.