# THE ATHABASCA.

## REID TOWING & WRECKING CO. v. THE ATHABASCA.

### (District Court, W. D. Michigan, N. D. December 17, 1890.)

1. COLLISION—NEGLIGENCE—HAZARDOUS UNDERTAKING—FAILURE TO WARN APPROACHING VESSEL.

The libelant constructed at Sault Ste. Marie a raft, 1,200 feet long, 250 feet wide, containing 1,500,000 feet of logs included in a sack-boom, consisting of timbers fastened together at the ends with chains, and having two or three cables thrown across to keep it from spreading. Two tugs were stationed, respectively, at the head and rear of the raft to help it along, and crowd it over to one side of the channel so as to permit of the passage of vessels. Entering a long, narrow channel in the Ste. Marie river, where the current is about four miles per hour, one of the tugs was sent down stream to warn approaching vessels. Such warning was given the Hiawatha and her tow, but none was given the Athabasca, a large steel passenger steamer, although her smoke was seen from the tug. As soon as the Athabasca became aware of the approach of the raft, she checked her speed as much as possible without losing her steerage, and kept as close as prudent to the Canadian shore. At this time the raft was sweeping rapidly down stream, with a tug at either end, striving to pull it to the opposite side of the river. This resulted in carrying over the ends, leaving a large bulge in the middle of the raft, reaching within 60 feet of the Canadian shore. The Athabasca, not having sufficient room left her in which to pass safely, changed her course, and went through the raft, stem on, breaking the boom and scattering its contents, resulting in a total loss, amounting to $12,000, which the libelant seeks to recover. *Held*, that it was a hazardous undertaking to take a raft of such size, form, and structure down the Ste. Marie river, knowing the perils incident to the almost constant passage of vessels, the swiftness of the current, and the occasional narrowness of the stream; and that it was an added negligence not to take effective measures to warn the Athabasca before she reached the narrows, her approach being known; and that such negligence constituted the cause to which the collision must be attributed.

2. TOWING RAFTS IN NAVIGABLE STREAMS—USAGES AND CUSTOMS OF NAVIGATION—
   MUTUAL RIGHTS.

   *Held*, that both Canadian and federal courts clearly recognize the right to tow
   logs in raft on navigable streams, such as the Ste. Marie, but that such right must
   be exercised with due *regard to the rights of others*, and the *general usages and
   customs* of navigation and commerce on such waters; and that while the libelant,
   in the exercise of such right of towage, was entitled, for the protection of its raft,
   to full observance on the part of others of the established principles of navigation,
   yet the manner in which the libelant exercised such right would necessarily affect
   its claim upon the diligence of others.

3. SAME—DIVISION OF DAMAGES—ACCESSORY NEGLIGENCE—FACTS CONSIDERED.

   *Held* that, the negligence of the libelant being established as the inducing cause
   of the collision, the charge of accessory negligence on the part of the respondent
   must be clearly made out before the damages should be divided; and, upon consid-
   eration of the facts, that none of the grounds suggested as showing contributory
   negligence on the part of the Athabasca are sufficiently established to warrant the
   court in dividing the damages.


In Admiralty.

*H. M. Gillett* and *H. H. Swan*, for libelants.

*F. H. Canfield* and *A. McMurchy*, for claimants.


SEVERENS, J.   The River Ste. Marie, which is the outlet for the wa-
ters of Lake Superior, constitutes the avenue for navigation and commerce
between the ports on that lake, (and some upon the river itself,) and
those below upon the other great lakes.   It is the thoroughfare for a large
and increasing number of steam and sailing vessels of nearly all the classes
employed in navigation, in the carrying of passengers and freight.   As
many as 60 vessels, upon an average, pass up and down through the ca-
nal at Sault Ste. Marie daily.   It is also used in the transportation of
logs in rafts from the forests around Lake Superior, by floating and tow-
ing to their destination at various points on the lower lakes.   These rafts
are made up again at the foot of the Sault Ste. Marie, after they have
passed the rapids at that place, and are taken below in the convoy of tugs.
The passage of these rafts down the river has been rather occasional, and
not of very frequent occurrence, but has been continued during recent
years.   The river, after passing the Sault, and running some distance below
it, sweeps, in a comparatively narrow channel, to the north-east, and,
bending around to the south-east, divides on Squirrel island, and, after it
has reunited, descends into Lake George.   This narrow channel is about
a mile long, and is in the form of an arc, the convex side of which is on
the north.   The current runs through this channel ordinarily at the rate
of about four miles an hour.   The navigable portion of the channel is
some four or five hundred feet wide.   On the west end of it, and on the
north side thereof are situated Hollister's mills, and on the same side,
about half-way down to Squirrel island, is Cunningham's dock.   The dock
is not far from the northernmost part of the arc.   The western channel
around Squirrel island is the one used in navigation, and there is a point
covered with trees and shrubbery projecting somewhat into the river from
the south side towards the north-east just above this island, which par-
tially obstructs the view from the river, as one ascends from Lake George
alongside of Squirrel island, over the upper portion of the bend in the
river already described.

The facts in the present case, as I collect them from the evidence, are that the libelant, the Reid Wrecking & Towing Company, in July, 1888, having constructed a raft of logs at the foot of the Sault Ste. Marie, undertook to float and tow it down the river into Lake Michigan. The raft was about 1,200 feet long, and 250 feet wide, and was inclosed in a sack-boom, the logs lying crowded together in the boom, unfastened, except as they were surrounded and kept together by the boom. This latter consisted of long, stout, heavy timbers, strongly fastened together at the ends with chains. Across the body of the raft, at different places, were thrown two or three guys, or cables, fastened to the sides, intended to keep the raft from spreading. The raft contained 1,500,000 feet of logs. At the head of the raft was stationed the tug Avery, and at the rear the tug Dowling. On the raft were several, and doubtless a sufficient number of, hands. The purpose of the tugs was to help the raft along, and to pull and crowd it over to one side of the channel, in order to let vessels going up or down pass by, and otherwise keep it clear of collisions. Thus equipped, the libelant started down the river with the raft, and on the 5th day of July, before reaching Hollister's mills, where the channel grows narrow, the tug Dowling was dispatched down stream to look below the straits and find and warn of the approaching raft any vessels which might be coming up. The tug sighted the Hiawatha, which had the Minnehaha in tow, and gave it warning, and then returned and took its place at the stern of the raft. The smoke of some other ascending vessel was seen from the Dowling. For some reason, not definitely shown, but probably because the Dowling was needed at the raft, which was rapidly coming into the narrows, no warning was sent down to the other ascending vessel. This proved to be the Athabasca, a large steel passenger steamer, of 1,147 tons burden, 270 feet long, and 38 feet in breadth of beam, belonging to the Canadian Pacific Railway Company, and forming one of a line of steamers plying between Owen sound and Port Arthur. The steamer had on board a cargo of merchandise, and about 100 passengers, besides her crew. Nearly opposite, but a little above, Hollister's mills lay a sunken vessel, some distance out from the American shore. As the raft came down stream it was carried around by the head towards the Canadian shore to avoid the sunken vessel, and then it was bent around to the south again, so as to avoid and give way for the vessels which were known to be coming up through the narrows. The effect of this was to whip the tail end of the raft over against the dock at Hollister's mills, and a scow lying there was swept loose and carried down the river. Meanwhile the Hiawatha had steamed up to and was lying alongside of Cunningham's dock, with the Minnehaha behind in line. At about the time the raft entered the narrows, the Athabasca was coming up around the point of the American shore lying over opposite and above the upper end of Squirrel island. The raft had not yet been seen by the Athabasca, and was not discovered, as I think the preponderance of the evidence shows, until the steamer had traversed about half the distance from Squirrel island to Cunningham's dock. When at this point, she was signaled by the Avery's whistle to check. This she did, and

proceeded up slowly alongside of the Hiawatha, and then, moving as slowly as she could and maintain her steerage, ported her wheel, keeping in towards the Canadian shore, as closely as it was prudent to do. During all the time after the Athabasca became aware of the nature of the raft and its form, the latter was passing down with the full rate of the current, the tugs at either end trying to pull and crowd the raft over to the south side far enough to give room for the approaching vessel. The effect of this was to carry over the ends, leaving a large swell or bulge at the middle on the north, reaching within 60 feet or so of the Canadian shore. The swiftness of the current, the great weight and momentum of the raft, and its loose, pouching structure, rendered it impossible for the tugs to make any considerable impression on its course at that point. The Athabasca, not daring to go so far shoreward as she found necessary in order to escape, as she approached the raft, changed her course, and went, stem on, straight through it, breaking the boom. The result was that the raft was broken up, and its contents, scattered and drifting down, were lost in the bayous and swamps and the open waters below, the loss amounting to $12,000. The libelant seeks to recover this in the present proceeding.

In my opinion, it was a hazardous undertaking on the part of the libelant to attempt to take a raft of the size, form, and structure of this one down the River Ste. Marie, knowing the perils which were likely to arise from the almost constant passage of vessels, the swiftness of the current, and its occasionally narrow channels. It was an added negligence in the libelant that it did not take effective measures to warn the Athabasca before she came up into the straits. Especially is this so because the approach of the vessel was known. The reason why the warning was not given probably was that the forces of the libelant were urgently needed to manage the raft, then coming into the narrows. The necessity for the warning is shown to have been understood and was in fact admitted by the precaution taken in sending the tug below for that purpose. But its mission was too hurriedly and imperfectly executed. The imprudence of the undertaking to move such a raft through this river, with the added failure to give proper notice to the Athabasca of the coming of the raft through this narrow portion of the channel, in my opinion, constituted the negligence to which the collision is attributable. It must be conceded that it is not unlawful to tow logs in rafts on navigable streams such as the Ste. Marie. The legislation and the course of judicial decision in Canada, as well as in the United States, recognize such use of these waters as proper and as of right. 1 Rev. St. Can. 1886, p. 156, art. 27, respecting navigation of Canadian waters; Rev. St. U. S. § 4233; *The David Morris*, Brown, Adm. 274; *Lallande* v. *The C. D., Jr.*, Newb. Adm. 501; *U. S.* v. *One Raft of Timber*, 13 Fed. Rep. 796; *Muntz* v. *Raft of Timber*, 15 Fed. Rep. 557; *The F. & P. M. No. 2*, 36 Fed. Rep. 264; *The Henry Buck*, 38 Fed. Rep. 611; *Seabrook* v. *A Raft*, 40 Fed. Rep. 596; *The Joggins Raft*, Id. 533. But that right must be exercised with due regard to the rights of others and to the general usages and customs of navigation and commerce on such waters. This is a part of

the doctrine contained in the references under the foregoing proposition. And while that right is being so exercised within its proper limitations, and with proper regard to the requirements and usages of commerce, the proprietor is entitled to claim from others due observance of the fundamental principle of navigation, which is embodied in the statutes and rules, as well as in the decisions of the courts upon this subject, that the craft having the best facilities for its own management is charged with a corresponding duty to employ those facilities, so as to avoid collision and injury. Peculiar circumstances might require a modification of the rule, such, for example, as peril to human life. And the manner in which he exercises his own right must necessarily affect his claim upon the diligence of the other party. Applying these principles to the facts of the present case, it is impossible, in my opinion, to exonerate the libelant from fault, or to resist the conclusion that that fault was the primary cause of the disaster which followed.

But the libelant further insists that, even if it be adjudged to have been guilty of negligence in the construction and management of the raft, the Athabasca was also negligent in her own management, and that, at least, the damages should be divided. Some question is made by counsel for the claimant whether, in view of the charge in the libel that the conduct of the Athabasca was wanton and intentional, the libelant is at liberty to stand now upon an accusation of mere negligence as the ground for recovery. Upon this the libelant asks leave to amend the libel in that particular. The practice of allowing amendments in the admiralty practice is liberal, and I should feel inclined to allow the amendment if it were necessary to the saving of the rights of parties. Ben. Adm. p. 382, § 143. But, as my opinion is against the libelant upon the facts, the case is disposed of upon its merits.

It being established that the negligence of the libelant was the inducing cause of the collision and loss, the charge of accessory negligence on the part of the respondent as the foundation for compelling it to share the damages must be clearly made out. In this the authorities all concur. *The Comet*, 9 Blatchf. 323; *The Sunnyside*, Brown, Adm. 247; *Taylor* v. *Harwood*, Taney, 444; *The E. B. Ward, Jr.*, 20 Fed. Rep. 702; *The Catherine*, 2 Hagg. Adm. 145; *The St. Paul*, per BROWN, J., E. Dist. Mich., not reported. The damages are not divided if the fault of one be slight, bearing but little proportion to the fault of the other. *The Great Republic*, 23 Wall. 20. In my opinion the evidence fails to make out in any satisfactory way that the Athabasca was guilty of such negligence in her conduct as should subject her to this liability. It is insisted—*First*, that the Athabasca could have kept her heading in the current below Cunningham's dock, and waited until the tugs had drawn the raft over to the other side and given way for her passage. But it is doubtful whether the extent of the danger was, or should have been, known by the Athabasca until she was well up to the Hiawatha and her tow. It is true, she might have seen that there was a raft ahead, when she was a quarter of a mile below, but she had a right to expect that it was manageable, and would be so conducted as to afford passage-way

according to its duty. *Sicluna* v. *Stevenson*, L. R. 8 App. Cas. 549.
This belief was rightly strengthened by the fact already alluded to, that
no warning of danger had been given.　Only a very few minutes elapsed
between the getting of adequate notice of the danger and the actual col-
lision.　The Athabasca had on board of passengers and crew, all told,
about 150 people, the value of whose lives bore no comparison to the
value of the raft, and would fully justify giving a highly paramount at-
tention to the security of the vessel.　So long as her passengers were in
peril she might rightly consider her own safety as of the first impor-
tance, and act accordingly.　It may be that it would have been practi-
cable to have remained below in the channel, beating up stream suffi-
ciently to have kept headway, until the raft passed.　Nevertheless, I
do not think negligence can be imputed to the vessel by the libelant, in
view of the exigency of the situation, which the libelant had brought
on.　Large allowance must be made to a respondent who has been obliged
to act in a moment of impending peril of collision, produced by the fault
of another, and a mere mistake does not make the vessel liable.　*The
Jupiter*, 1 Ben. 536; *The Belle*, Id. 317; *The Santiago de Cuba*, 10 Blatchf.
444.　Besides, it is, indeed, somewhat doubtful whether the raft would
have cleared the vessel lying within the channel below, and she could
not be required to lie by and receive the blow of the raft on her bow
or broadsides, if, as it would appear, that was the more dangerous posi-
tion in which to receive it.　*Secondly*, it is urged that the Athabasca
might have stopped along-side of Cunningham's dock.　By this must
be meant that she could have laid by the Hiawatha and outside of that
vessel from the dock.　In my opinion, that would have been more dan-
gerous than to have gone ahead, where the channel was wider and try
the chance of getting around the raft.　*Thirdly*, it is urged that she
could have run her bow ashore into the bank, and held herself there
while the raft passed.　The Athabasca had no means of knowing with
what safety this could be done.　The charts of the river showed the
limits of the navigable channel, between the northern one of which and
the shore was a strip of unknown character.　It is impossible for me to
hold that the Athabasca would have been justified, even, if she had
taken such a course.　*Lastly*, it is said she could have turned in the river
and gone down out of the way.　At one time on the hearing I had an
impression that there was some plausibility in this suggestion.　But
taking into consideration the narrowness of the channel, the length of
the vessel, and distance required in which to make the turn, and es-
pecially the large preponderance of the testimony of experts in such nav-
igation, showing its difficulty and danger, it appears to me that, at least,
it was not clear negligence in the Athabasca to have refrained from tak-
ing that course in the circumstances in which she was placed.　Let a
decree be entered dismissing the libel.