**UNITED STATES of America,**
**Appellant,**

v.

**KENNEBEC LOG DRIVING COMPANY et al., Appellees.**

**No. 73–1163.**

United States Court of Appeals,
First Circuit.

Argued Sept. 12, 1973.

Decided Nov. 30, 1973.

As Amended Dec. 19, 1973.

Walter Kiechel, Jr., Deputy Asst. Atty. Gen., with whom Wallace H. Johnson, Asst. Atty. Gen., Peter Mills, U. S. Atty., Raymond N. Zagone, Thomas C. Lee, and Carl Strass, Attys., Dept. of. Justice, were on brief, for appellant.

Roberts B. Owen, Washington, D. C., with whom William D. Iverson, Covington & Burling, Washington, D. C., Vincent L. McKusick, Daniel E. Boxer, Pierce, Atwood, Scribner, Allen & McKusick, Loyall F. Sewall, Verrill, Dana, Philbrick, Putnam & Williamson, Portland, Maine, Norman M. Heisman, and Ellis A. Horwitz, Philadelphia, Pa., were on brief, for appellees.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

Defendant Kennebec Log Driving Company is in the business of driving pulp logs down the Kennebec River to paper mills downstream. Defendants Scott Paper Company and Hudson Pulp and Paper Corporation have in the past engaged Kennebec Log Driving Company to perform this service for them, although at the present time only Scott Paper Company continues to do so.[1] The United States claims that this activity violates two provisions of the Rivers

1. In 1971 Hudson Pulp and Paper Corporation indicated that it intended to terminate its relationship with the Kennebec Log Driving Company and it now no longer places logs in the river.

and Harbors Act of 1899 in that the floating of masses of logs and the erection and maintenance of booms to guide and collect these logs constitutes obstruction to navigation on a navigable water of the United States without a permit in violation of section 10 of the Act (33 U.S.C. § 403), and that the sinking of some waterlogged timber and the sloughing off of significant quantities of bark from the floating logs constitutes deposit of refuse in a navigable water of the United States without a permit in contravention of section 13 of the Act (33 U.S.C. § 407).[2] The government sought an injunction against further log driving and a court order requiring affirmative remedial action including the removal of all sunken logs from the Kennebec and the dismantling of all logging booms on the river.

On cross motions for summary judgment the court below, 356 F.Supp. 344 (D.Me.1973), found that the Act of May 9, 1900 (33 U.S.C. § 410) created an exception from the provisions of the Rivers and Harbors Act of 1899 for log driving on rivers where log driving is the principal form of navigation, and, since it was uncontested that the Kennebec falls into that category of river, that the activities of defendants are legal despite the lack of any permits.

I

This case requires us, in the eighth decade of the twentieth century, to scrutinize the legislative history of two statutes passed at the turn of the century, as well as the wording of the statutes themselves, to see how they apply to a lawsuit impelled by contemporary concern over the quality of our environment. The sole issue presented to us involves interpretation of the Act of May 9, 1900 and of certain provisions of the

Rivers and Harbors Act of 1899. Our concern is with the scope of the Act of 1900 and the extent to which it overrode the earlier Act as applied to log driving on rivers like the Kennebec.

Log driving has been carried out on the upper Kennebec River by the defendant log driving company since 1835[3] and the techniques involved have remained essentially unchanged down to the present. Pulpwood logs are placed in the river and allowed to float downstream on the force of the current. Booms, usually consisting of strings of logs fastened together with chains, are placed so as to guide the logs away from inlets and obstacles. Where there is insufficient current to carry the logs downstream they are collected in large booms and gathered together and formed into rafts which are towed by small boats to a point where the logs can again be released into the current. Where dams block the river the logs are sluiced over them. At the mill site the logs are guided toward the shore and removed from the river. In the course of a drive a number of logs inevitably become waterlogged and sink to the bottom.[4] Another acknowledged side effect of the practice of log driving is the deposit into the river of quantities of bark which peel off the floating logs. No permits have ever been sought by defendants from any federal government agency for their log driving activities.

Recent widespread concern over the quality of the environment has resulted in vigorous remedial action in a number of areas, including the enactment of comprehensive air and water quality legislation by the Congress. Although the 1970 Federal Water Pollution Control Act[5] and the 1972 amendments[6] do not deal directly with the ecological impact of log driving upon the rivers used for

2. Defendants conceded below that the upper Kennebec is a navigable water of the United States within the purview of the Rivers and Harbors Act of 1899.

3. Private and Special Laws of Maine of 1829–35, ch. 590 (1835).

4. According to the minimum figure presented to the district court, 1.98% of the pulpwood placed in the river sinks to the bottom.

5. 33 U.S.C. §§ 1151–1175.

6. 33 U.S.C. §§ 1251–1376.

such purposes,[7] concern over this problem in the state of Maine has led to action designed to curtail and eventually eliminate logging in the state's rivers. In 1971 the Great Northern Paper Company forecast the end of its log drives on the West Branch of the Penobscot River by 1972 at the latest, and Scott Paper Company announced publicly that it would terminate log driving on the Kennebec, the very activity in issue here, no later than October 1, 1976.[8] And in May of 1971 the Maine legislature enacted a statutory prohibition against all log driving on Maine rivers effective October 1, 1976, 38 M.R.S.A. § 418.

In order to discuss the proper application of the Acts of 1899 and 1900 to the activity in issue a brief description of these Acts, and their legislative history, is appropriate. Section 10 of the Act of 1899 bans the creation of obstructions to the navigable capacity of navigable waters of the United States, including the "building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty or other structures in any . . . navigable river" unless permission is obtained beforehand from the Secretary of the Army (on recommendation of the Chief of Engineers). Section 13 of the Rivers and Harbors Act of 1899 is the now famous Refuse Act and bans the deposit of refuse matter into navigable waters of the United States, either from floating craft or from the shore, or the deposit of material on the banks of any navigable water which might be washed into the water and obstruct navigation, unless prior permission is obtained from the Secretary of the Army.

Section 15 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 409) bans certain specific activities when conducted in such a way as to obstruct navigation. Relevant to our discussion is the prohibition contained in this section on the floating of "loose timber and logs" and "sack rafts of timber and logs" on streams or channels actually navigated by steamboats whenever it might "obstruct, impede, or endanger navigation". Section 15 contains no provision for permits; its proscriptions, unlike those of sections 10 and 13, are absolute.

The legislative history of the Rivers and Harbors Act in 1899 in general, and of sections 10 and 13 of that Act in particular, has been explored in some depth by the Supreme Court in United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960), United States v. Standard Oil Co., 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966), and, most recently, in United States v. Pennsylvania Industrial Chemical Corp., 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973). It is clear that the Act was considered by Congress to be not much more than a compilation of various pre-existing enactments. An 1897 report of the Chief of Army Engineers, submitted to Congress by the Secretary of War,[9] had set out the text of all federal laws concerning the protection of navigable waters and had recommended a new statute which would assemble the previously scattered legislation on the subject and would clarify some of the language. The understanding of the Congress as to this proposed new law was that in relation to prior law "There are not ten words changed in the entire thirteen sections".[10] As passed the Act of 1899 was said to contain "no essential changes in the existing law." [11]

But despite the congressional impression that very little that was new was contained in the Rivers and Harbors Act of 1899 the language in section 15 concerning log driving apparently originated in the Chief of Engineer's report. Unlike sections 10 and 13, this part of section 15 appears to have no statutory

7. The parties agree that the recent legislation has no direct bearing on this litigation.

8. See 1 Maine Leg.Rec. 470, 497 (1971).

9. H.R.Doc.No.293, 54th Cong., 2d Sess. (1897).

10. Statement of Senator Frye, Chairman of the Senate Rivers and Harbors Committee, 32 Cong.Rec. 2297 (1899).

11. Statement of House Conferees, 32 Cong. Rec. 2923 (1899).

antecedents. Since the Act of 1899 engendered relatively little legislative comment or debate, and what there is does not mention log driving, the complete ban on this activity written into federal law in section 15 comes down to us without the usual clarifying light of legislative history.

The sweep of the prohibition on log driving contained in section 15 very quickly led to congressional reappraisal. The legislative history leading up to the adoption the next year of what is now 33 U.S.C. § 410 indicates that the concern which led to this amendment of section 15 related to the conflict between the needs of those who used the rivers to navigate steamboats and those who used the same rivers to float logs downstream to mill sites.[12] The language of section 15 resulted in a great overweighting of the balance in favor of the steamboat, which imbalance the later Act was meant to rectify.

A bill to remove the log driving prohibition from section 15 was introduced in the first days of the very next session of Congress and referred to the House Committee on Rivers and Harbors.[13] The committee reported back a bill which would have exempted the Mississippi River above the St. Paul boom, and certain of its tributaries, from the reach of section 15, with provision for the regulation of log driving on those waterways by the Secretary of War. The report submitted to the House by the committee discussed the methodology of log driving on the rivers in question, and also discussed the extent of steamboat navigation. It found that "the inevitable result of carrying on this logging business in the way it is carried on is to obstruct, impede, and endanger such steamboat navigation at certain seasons of the year",[14] but concluded that section 15 was too harsh a remedy. After

House passage of this bill the Senate Committee on Commerce reported an amended bill which would have extended to any river, rather than just the upper Mississippi, the provision for regulation of log driving of the House bill, "whenever in [the Secretary of War's] judgment such regulations are necessary to equitably adjust and govern the conflicting interests of logging and other forms of navigation."[15] The bill also provided that whenever such regulations had been issued the river affected would then be exempt from section 15. The Conference Committee then devised the compromise measure which became the Act of May 9, 1900. It extended an exemption to section 15's ban on log driving to those rivers on which log driving is the principal form of navigation and also provided that the Secretary of War (now the Secretary of the Army) was empowered to issue regulations "so framed as to equitably adjust conflicting interests between the different methods or forms of navigation" on such rivers.[16]

II

The parties disagree as to the significance to be accorded to the fact that defendants are now barred by Maine law from continuing the activity at issue here after October 1, 1976. Defendants contend that the 1976 deadline makes this case, while obviously not technically moot, realistically unnecessary and undeserving of expenditure of the parties' and the court's energies. There are a number of reasons why we are unpersuaded by such arguments. First, the cessation of further log driving only goes to one aspect of the case, the propriety of a court order enjoining the activity, and does not affect the question of whether any remedial relief should be granted. Second, it is always possible that the present state deadline

12. *See* H.R.Rep.No.731, 56 Cong., 1st Sess. (1900).

13. 33 Cong.Rec. 840 (1900).

14. H.R.Rep.No. 731, 56 Cong., 1st Sess. (1900) at 3.

15. 33 Cong.Rec. 4405 (1900), Sen.Rep.No. 1035, 56 Cong., 1st Sess. (1900).

16. 31 Stat. 172, now codified as 33 U.S.C. § 410.

might be extended or eliminated. Third, three years is a fairly long time, long enough for the deposit on the bottom of the Kennebec of a not insubstantial number of logs, as well as loose bark.[17] Most important, this suit, although belated, charges a violation of federal laws designed to protect and conserve our rivers, described by the Supreme Court (quoting Mr. Justice Holmes) as "more than an amenity . . . a treasure."[18] Resolution of the issue presented in this case, with its possibility of recurrence wherever log driving is still carried on, presents us with what we consider to be an important question, and one which it is our duty to resolve.

■ It is clear that the upper Kennebec River, where the defendants engage in log driving, is one on which the principal form of navigation is log driving and thus is within the purview of the Act of May 9, 1900 (33 U.S.C. § 410). The government argues, however, that any exemptions from the provisions of the Rivers and Harbors Act of 1899 contained in the later Act are condi-

tioned upon prior promulgation by the Secretary of the Army of regulations adjusting navigational conflicts. We cannot accept that analysis. The structure of the Act is such as to make the government's interpretation improbable. It begins with a flat and unconditional exemption from the prohibition contained in section 15 as to log driving. It then provides that such exempted activity shall be subject to regulations prescribed by the Secretary of the Army and states that the Secretary is "authorized and directed" to prescribe rules and regulations, so framed as to adjust conflicts between modes of navigation. Logically, this format is consistent only with the view that the promulgation of regulations is a condition subsequent, not a condition precedent, to the exemption.[19] We conclude that the duty of the Secretary of the Army, under the Act of May 9, 1900, to issue rules and regulations is not a condition precedent to the exemption contained in the Act to the ban on log driving contained in section 15 of the Rivers and Harbors Act of 1899.[20]

17. Based upon the figure, given in oral argument, of 300,000 cords of wood floated down the river each year and accepting approximately 2% as the rate that such logs sink to the bottom (*see* n. 4 *supra*) then in three years about 18,000 cords—or 2,304,000 cubic feet—of waterlogged wood would be deposited in the upper Kennebec.

18. United States v. Standard Oil Co., 384 U. S. 224, 230, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966), quoting from New Jersey v. New York, 283 U.S. 336, 342, 51 S.Ct. 478, 75 L. Ed. 1104 (1931).

19. Had Congress intended to make the exemption from section 15's ban on log driving conditional upon prior promulgation of navigational rules it could clearly have chosen a more apparent means than the wording of the Act of 1900. Particularly is this so in view of the clear and unequivocal way in which Congress framed sections 10 and 13 of the Act of 1899. In those sections certain behavior is illegal unless prior permission is obtained. Furthermore, in the legislative history of the Act of 1900 an alternative phrasing was considered and rejected which would have created an exemption only after rules and regulations had in fact been promulgated for the particular river. It is

also highly unlikely that Congress intended an entire set of rules and regulations, as distinguished from a permit as in sections 10 and 13, to be a condition precedent to legal behavior. And where a river like the upper Kennebec is concerned, on which, as found below, no significant navigation other than by log driving has ever taken place, there would appear to be little logic in requiring that regulations be issued for the purpose of resolving a nonexistent conflict between forms of navigation, before the exemption would be effective.

20. The government also contends that the language used in the Act of 1900, "floating loose timber and logs, or sack rafts, so called, of timber and logs" does not refer to the entire practice of log driving but only those aspects literally encompassed in the language used. But there is not the slightest reason to believe that Congress meant the statute to have such a cramped and unnatural reading. The terms set out above were obviously a way to describe the traditional log drive as a whole and were the very terms used in section 15 of the Rivers and Harbors Act of 1899. Moreover, the language used rather adequately described the Kennebec log drive as it is carried on

We now come to the heart of the issue. The district court, in a thoughtful and well documented opinion, concluded that the Act of May 9, 1900 not only exempted log driving on rivers like the Kennebec from the flat prohibition of section 15 of the Rivers and Harbors Act of 1899, but from sections 10 and 13 as well. It thought such a result required because otherwise one would have to "attribute to Congress an intent to legalize log driving and at the same time to prohibit its unavoidable side effects." [21]

 While we agree with the district court, for reasons set forth below, that the exemption to section 15 of the 1899 Act in the Act of 1900 necessarily extends as well to section 10, we do not agree that it also extends to the pollution control aspects of section 13. First of all, there is no logical dilemma in finding log driving on rivers like the Kennebec exempt from section 15 but not exempt from section 13. Section 13 does not operate as a complete prohibi-

tion on any activity. Discharge of refuse is illegal only if no permit is obtained beforehand. There is a vast array of human activity, particularly commercial activity, which requires prior governmental permission. But one does not in common sense terms think of such activity as prohibited. Rather, it is thought that it is limited or controlled. The very sweep of section 13 argues against the view that Congress could have meant it as a stark ban on all behavior encompassed within its broad terms. Instead, it was envisaged as a means of regulating and bringing under scrutiny actions which might threaten the well-being of the nation's waterways. In contrast, section 15 is absolute. There is no way to escape its proscription other than to entirely cease the illegal conduct. Congress, in retaining the applicability of section 13 to log driving, did not legalize log driving and at the same time prohibit its unavoidable side effects and so produce a contradictory result. It merely quite logically ex-

today. "Floating of loose timber and logs" is the way logs are moved by defendants on those stretches of the Kennebec where the current is strong enough to carry the logs downstream, and "sack rafts . . . of timber and logs" refers to the means used to move logs across the places lacking strong current. (For descriptions of sack rafts see The Mary, 123 F. 609, 611, 613 (S.D.Ala.1903) and The Athabasca, 45 F. 651, 653 (W.D.Mich., N.D.1890)). Therefore, we find that the traditional log drive, as carried out on the Kennebec, is encompassed by the terms used in 33 U.S.C. § 410.

The government also makes arguments based upon the premise that the first paragraph of 33 U.S.C. § 410 which refers to "floating loose timber and logs, or sack rafts, so called, of timber and logs" is more limited in scope than the second paragraph which refers to "floating of loose timber and logs, and sack rafts (so called) of timber and logs *and other methods of navigation* on the streams and waterways, or any thereof, of the character, as to navigation, heretofore in this section one hereof described [first paragraph of this section]." [Emphasis added.] But since the second paragraph has to do with the authority of the Secretary of the Army to promulgate regulations, the reference to "other methods of navigation" is not meant as a description of additional as-

pects of the practice of log driving, but as a description of entirely different modes of river navigation with which log driving can potentially conflict, and thus to which regulations resolving navigational conflicts would refer. We therefore find no basis in the statutory language, and also find no basis in the legislative history, or in logic, for the offered premise and reject the arguments based thereon.

21. There is no legal precedent on the precise point presented in this appeal. The only reported cases involving challenges to logging practices under the Rivers and Harbors Act of 1899 or its predecessor statutes did find that *booms* were subject to challenge as obstructions to navigation, United States v. Bellingham Bay Boom Co., 176 U.S. 211, 20 S.Ct. 343, 44 L.Ed. 437 (1900), United States v. Wishkah Boom Co., 136 F. 42 (9th Cir. 1905), but *Bellingham* was decided prior to passage of the Act of May 9, 1900 and *Wishkah*, although it presented a case where the Act of 1900 would appear to have been at least facially applicable, simply ignored that statute. In United States v. Marthinson, 58 F. 765 (D.S.C.1893), the court found that the provisions of the Rivers and Harbors Act of 1890 barring obstruction to the navigable capacity of rivers did not apply to the floating of logs or rafts of logs.

empted it from the absolute ban of section 15 while retaining the much more limited restriction produced by section 13. Such a reading of the scope of the Act of 1900 produces a consistent and reasonable legislative scheme. Furthermore, Congress did not say in the Act of May 9, 1900, as it very easily could have, that log driving on the particular rivers was to be exempt from all provisions of the prior Act. In terms the exemption extends only to section 15.

The legislative history demonstrates that the concern of Congress in enacting the Act of 1900 was the navigational conflict between steamboat traffic and log driving, which conflict section 15 of the 1899 Act had resolved entirely in favor of the steamboat.[22] It was in the context of the lifting of the complete ban of section 15 that statements were made to the effect that log driving was being legalized. However, there is not a word in the legislative history, or in the 1900 Act, concerning the sinking of waterlogged timber, the sloughing of bark, or the pollution caused by log driving. After exhaustive research into the history and purposes of the Rivers and Har-

bors Act of 1899 the Supreme Court has concluded that section 13 of that Act was intended by the Congress to prevent pollution, as well as obstruction, of navigable waters.[23] As found by the Court, "the 'serious injury' to our watercourses . . . sought to be remedied [by the Rivers and Harbors Act] was caused in part by obstacles that impeded navigation and in part by pollution", and that the term "refuse" as used in section 13 "includes all foreign substances and pollutants . . . .", United States v. Standard Oil Co., 384 U.S. 224, 228–29, 230, 86 S.Ct. 1427, 1429, 16 L.Ed.2d 492 (1966), a finding strongly reaffirmed in United States v. Pennsylvania Industrial Chemical Corp., 411 U.S. 655, 671, 93 S. Ct. 1804, 36 L.Ed.2d 567 (1973). *See also* Illinois v. City of Milwaukee, 406 U.S. 91, 101, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972). The Court has also repeatedly admonished that the Refuse Act be dealt with by the courts "charitably", an admonishment that would not be heeded by us were we to find an exception to the operation of section 13 by virtue of a later statute which does not even mention section 13, or pollution, and whose

---

**22.** *See* H.R.Rep.No.731, 56 Cong., 1st Sess. (1900). For examples of the kinds of conflicts that had arisen between log driving and steamboats, *see. e. g.*, The Mary, 123 F. 609 (S.D.Ala.1903), Hall v. Chisholm, 117 F. 807 (6th Cir. 1902), The Athabasca, 45 F. 651 (W.D.Mich., N.D.1890).

**23.** We therefore disagree with the view expressed by the Seventh Circuit in United States v. United States Steel Corp., 482 F. 2d 439 (1973), to the effect that while Congress may have intended that the Refuse Act ban deposit of any matter of any kind, Congress thought that the Secretary of War would have no authority to deny a permit purely on non-navigational grounds. A fair reading of the Supreme Court's pronouncements on this subject, particularly United States v. Pa. Indust. Chem. Corp., which was handed down after the *U.S. Steel Corp.* decision, can only lead to the conclusion that its study of the Rivers and Harbors Act of 1899 and its history convince the Court that the Congress was concerned with pollution *ab initio*. This view is supported by the wording of section 13, in that while the ban

on dumping of material on the banks of waterways is illegal only if obstruction to navigation results, the ban on dumping of matter directly into the water . is not so limited. Furthermore, predecessor statutes had included in the list of particular materials barred from deposit materials like the "sawmill waste", "ballast", "steam-boat ashes", "oysters and rubbish" referred to by Mr. Justice Douglas in United States v. Standard Oil Co., 384 U.S. 224, 229, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966), and characterized by him as "pollutants". Contemporary concern in the Congress over the hazard to the public welfare posed by water pollution can be discerned in H.R.Rep.No.89, 56 Cong., 1st Sess. (1900), in which the House Committee on Commerce proposed the creation of a scientific commission to investigate water pollution, saying in part, "It is one of the inalienable rights of the people to have the water for drinking, for watering stock, for manufacturing, agricultural, and domestic uses, come to them in its natural accustomed flow, free from pollution or sewage cast into it . . . . ."

legislative history is barren of the least hint that the creation of such an exception was contemplated.

■ But while the matter of pollution is not mentioned or dealt with in the Act of 1900, the use of booms in the navigation of floating logs was recognized by reference to booms in the House Report.[24] Moreover, the use of booms is an integral part of the control of floating timber. Many of the regulations promulgated pursuant to the Act of May 9, 1900 recognize that the location and use of logging booms is often vital to any plan to minimize navigational conflicts.[25] Under these circumstances, it is clear that the district court was correct in finding that in exempting logging from the navigational restrictions of section 15 of the Act of 1899 the Congress must necessarily have also meant to exempt logging booms from any restriction contained in any other sections. This same analysis includes other aspects of log driving which might have a navigational impact. The purposes served by section 10 (and one of the purposes served by section 13) and the purposes served by section 15 in this matter are essentially the same. Furthermore, these interests are in large part preserved by the provision in the Act of 1900 for promulgation of rules and regulations to adjust navigational conflict.

The regulations which the Secretary of the Army is empowered to issue under the Act of 1900 are confined to the question of navigational conflicts, unlike the permits authorized under section 13 of the Rivers and Harbors Act of 1899 which are not so limited in terms.[26]

This is consistent with the view that Congress conceived of the Act of 1900 as resolving the navigational conflict between logging on waterways like the upper Kennebec River and other forms of water transport in favor of logging, but that it had no intent to exempt this activity from the pollution control features of section 13 of the 1899 Act.

■ We therefore find that the Act of May 9, 1900 exempts log driving on the upper Kennebec (and its necessary incidents, including the use of logging booms) from the provisions of the Rivers and Harbors Act of 1899 concerned with obstruction to navigation, and conflicts with other modes of navigation, but that nothing in the Act or its legislative history exempts this activity from the restrictions on pollution of navigable waters found in the Refuse Act (33 U. S.C. § 407).

### III

■ The district court found that section 13 is "facially applicable" to defendants' activities and that "peeled bark and sunken logs on the river bottom are deposits of 'refuse matter' within the meaning of section 13". We concur with these findings and remand for a determination of the question which the court below felt that it did not have to reach; whether there are certain deposits of material into navigable waters so intimately related to the actual conduct of navigation by water that despite the facial applicability of the statute it could not have been in the contemplation of Congress that it apply in such instances.[27]

---

24. H.R.Rep.No.731, 56 Cong., 1st Sess. (1900) at 3.

25. *See* 33 C.F.R. §§ 207.380, 207.360, 207.-780, 207.663 (1972).

26. In discussing the proviso in section 13 authorizing the issuance of permits the Supreme Court has said, "In exercising that authority the proviso requires the Secretary to rely on the judgment of the Chief of Engineers that anchorage and navigation will not be injured by such deposits. But even

in a situation where the Chief of Engineers concedes that a certain deposit will not injure anchorage and navigation, the Secretary need not necessarily permit the deposit, for the proviso makes the Secretary's authority discretionary—i. e., it provides that the Secretary 'may permit' the deposit." United States v. Pennsylvania Industrial Chemical Corp., 411 U.S. 655, 662, 93 S.Ct. 1804, 1810, 36 L.Ed.2d 567 (1973).

27. We mean to intimate no view as to whether or not any such interpretation of

If the district court finds a violation of section 13 of the Rivers and Harbors Act of 1899 it will then be faced with the question of appropriate relief. We have been advised by counsel that a permit program is now in effect. Should this not be so, this fact will of course be taken into account in framing any equitable decree affecting future log driving. Insofar as relief in the nature of removing the accumulated refuse of three quarters of a century is concerned, we recognize that the burden of removing all of the logs which may have sunk to the bottom of the river in seventy-three years is obviously an extremely heavy one. Hercules, asked to clean the Augean stables, diverted the courses of two rivers, but he had clean rivers to work with. Furthermore, defendants may be able to argue that they relied on long standing government action or inaction. While such reliance will not excuse disobedience to the law it may be a consideration to be weighed in the framing of broad equitable relief. The requirements of fairness invoked by the Court in United States v. Pennsylvania Industrial Chemical Corp., *supra*, in gauging the propriety of criminal sanctions, may also apply when extreme hardship may be caused by an equity decree in this type of case.

On the other hand, those who defend our nation's waterways confront us with compelling and urgent problems, in the words of the Supreme Court, a "crisis",[28] which requires that the courts act in the broad public interest. The preservation of our rivers was the task undertaken by the Congress when it enacted the Rivers and Harbors Act of 1899. That the age and obscurity of this statute does not diminish its force and that the prevention of pollution was at least one of its aims was made entirely clear in *Pennsylvania Industrial Chemical Corp.*, which was handed down by the Supreme Court after the decision below. Thus, while awareness of the

economic and practical burdens which might be placed upon those who use the rivers for logging may measurably limit the scope of relief given, it cannot today justify ignoring the terms of section 13 of the Rivers and Harbors Act of 1899.

Judgment vacated. Remanded to the District Court for proceedings not inconsistent with this opinion.

## STATUTORY APPENDIX

33 U.S.C. § 403

*(Section 10 of the Rivers and Harbors Act of 1899)*

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

33 U.S.C. § 407

*(Section 13 of the Rivers and Harbors Act of 1899)*

It shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or de-

---

the language of the statute can be justified, nor, if it can, whether defendants can take advantage of it.

**28.** United States v. Standard Oil Co., 384 U. S. 224, 225, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966).

posited either from or out of any ship, barge, or other floating craft of any kind, or from the shore, wharf, manufacturing establishment, or mill of any kind, any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state, into any navigable water of the United States, or into any tributary of any navigable water from which the same shall float or be washed into such navigable water; and it shall not be lawful to deposit, or cause, suffer, or procure to be deposited material of any kind in any place on the bank of any navigable water, or on the bank of any tributary of any navigable water, where the same shall be liable to be washed into such navigable water, either by ordinary or high tides, or by storms or floods, or otherwise, whereby navigation shall or may be impeded or obstructed: *Provided,* That nothing herein contained shall extend to, apply to, or prohibit the operations in connection with the improvement of navigable waters or construction of public works, considered necessary and proper by the United States officers supervising such improvement or public work: *And provided further,* That the Secretary of the Army, whenever in the judgment of the Chief of Engineers anchorage and navigation will not be injured thereby, may permit the deposit of any material above mentioned in navigable waters, within limits to be defined and under conditions to be prescribed by him, provided application is made to him prior to depositing such material; and whenever any permit is so granted the conditions thereof shall be strictly complied with, and any violation thereof shall be unlawful.

33 U.S.C. § 409

*(Section 15 of the Rivers and Harbors Act of 1899)*

It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft; or to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels; or to float loose timber and logs, or to float what is known as "sack rafts or timber and logs" in streams or channels actually navigated by steamboats in such manner as to obstruct, impede, or endanger navigation. . . .

33 U.S.C. § 410

*(Act of May 9, 1900)*

The prohibition contained in section 409 of this title against floating loose timber and logs, or sack rafts, so called, of timber and logs in streams or channels actually navigated by steamboats, shall not apply to any navigable river or waterway of the United States or any part thereof whereon the floating of loose timber and logs and sack rafts of timber and logs is the principal method of navigation. But such method of navigation on such river or waterway or part thereof shall be subject to the rules and regulations prescribed by the Secretary of the Army as provided in this section.

The Secretary of the Army shall have power, and he is authorized and directed to prescribe rules and regulations which he may at any time modify, to govern and regulate the floating of loose timber and logs, and sack rafts, (so called) of timber and logs and other methods of navigation on the streams and waterways, or any thereof, of the character, as to navigation, heretofore in this section described. The said rules and regulations shall be so framed as to equitably adjust conflicting interests between the different methods or forms of navigation; and the said rules and regulations shall be published at least once in such newspaper or newspapers of general circulation as in the opinion of the Secretary of the Army shall be best adapted to give notice of said rules and regulations to persons affected thereby and locally interested therein. . . .