**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**KENNEBEC LOG DRIVING COMPANY et al., Defendants-Appellants.**

**No. 75–1357.**

United States Court of Appeals, First Circuit.

Argued Nov. 4, 1975.

Decided Feb. 18, 1976.

Levin H. Campbell, Circuit Judge, concurred and filed opinion.

Roberts B. Owen, Washington, D.C., with whom William D. Iverson, Covington & Burling, Washington, D.C., Vincent L. McKusick, Daniel E. Boxer, Pierce, Atwood, Scribner, Allen & McKusick, John W. Philbrick, Verrill, Dana, Philbrick, Putnam & Williamson, Portland, Me., Norman M. Heisman and Ellis A. Horwitz, Philadelphia, Pa., were on brief for defendants-appellants.

Walter Kiechel, Jr., Acting Asst. Atty. Gen., Washington, D.C., with whom Peter Mills, U.S. Atty., Portland, Me., Edmund B. Clark, and Carl Strass, Attys. Dept. of Justice, Washington, D.C., were on brief, for plaintiff-appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

In 1971, the United States filed a suit against the Kennebec Log Driving Company, a Maine chartered membership corporation which has conducted annual log drives on the upper Kennebec River since 1835, and against its only present members, codefendants Scott Paper Company and Hudson Pulp and Paper Corporation (collectively, KLD). The action was grounded on Sections 10 and 13 of the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 403, 407. Plaintiff, claiming that the sinking of logs and bark

fragments incident to a log drive was "refuse" under the Act, sought an injunction against future log driving activities and an order requiring affirmative action to remove from the river the consequences of past log driving activities.

In the first phase of this litigation, the district court granted summary judgment for KLD, holding that the Act of May 9, 1900, 33 U.S.C. § 410, authorizing log driving on certain rivers where such activity was dominant, exempted log driving on the Kennebec from all the provisions of the Rivers and Harbors Act of 1899. *United States v. Kennebec Log Driving Co.*, 356 F.Supp. 344 (D.Me. 1973). We reversed, holding that while § 410 expressly repealed the absolute bar to log driving, and any prohibition of the use of log booms, contained in §§ 10 and 15 of the Rivers and Harbors Act, 33 U.S.C. §§ 403, 409, it left intact § 13, 33 U.S.C. § 407 [hereinafter § 13], which prohibited the discharge of any refuse unless accomplished under a permit from the Secretary of the Army. We remanded the case to the district court, concurring in its holding that § 13 was facially applicable to defendants' activities, but leaving open whether some deposits of material into navigable waters were so intimately related to a particular form of navigation, such as log driving, that the Congress did not intend such deposits to be considered "refuse". 491 F.2d 562, 570 (1 Cir. 1973), *cert. denied*, 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974).

On remand the district court held that § 13 did apply to KLD's log driving activity. It noted that the section proscribed the discharge of "any refuse matter of any kind" without prior permission from the Secretary of the Army, and that peeled bark and sunken logs fell within this description and within the compass of "refuse" as that term was made clear in *United States v. Standard Oil Co.*, 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966). The district court rejected defendants' argument that Congress knowing (a) that log driving was an important form of navigation and (b) that some sinkage of logs and bark were inevitably involved in any log drive, could not have intended to proscribe the

sinkage of water-logged logs and bark fragments. Relying on our opinion; 491 F.2d at 568–69, that § 13 was not an absolute bar but a bar subject to permission granted on certain conditions, the district court saw no conflict between Congress' desire to permit log driving and a submission of this activity to regulation through permits calculated to minimize pollution.

It therefore granted the government's motion for summary judgment for a declaration that § 13 was applicable to KLD's log driving activities, but reserved consideration of the issue of injunctive relief and certified the question of liability under 28 U.S.C. § 1292(b). *United States v. Kennebec Log Driving Co.*, 399 F.Supp. 754 (D.Me.1975).

Defendants present an intricate and tightly woven argument which can be telescoped into the following points. (1) Section 13 is predominantly prohibitory; its regulatory aspects are purely within the discretion of the Secretary of the Army. *United States v. Pennsylvania Indus. Chem. Corp.*, 411 U.S. 655, 662, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973) (PICCO). (2) The breadth and stringency of the prohibition are so extreme, and the possibility of exemption through unrestricted discretion so remote, that Congress could not have intended the bar of § 13 to apply to incidents of normal commercial navigation. (3) If § 13 applies to log drives, it must also apply to the traffic of river vessels. This construction would render all voyages of all vessels in the past 70 years illegal. (4) The inaction of the Secretary of the Army for three-quarters of a century, in failing to insist on a pollution discharge permit for any log drive, is an administrative interpretation that § 13 is not applicable to defendants' business.

It has been argued that any such search for Congressional intent is made irrelevant by *United States v. Standard Oil Co.*, 384 U.S. 224, 229, 86 S.Ct. 1427, 1430, 16 L.Ed.2d 492 (1966), where the court, referring to the broad coverage of the Act of "any refuse matter of any kind or description", stated that "[m]ore comprehensive language would be diffi-

cult to select." This language is sufficient for our brother Campbell. But we hesitate to rest on it, since the court did not have to face the question whether refuse which is a normal incident of lawful navigation constituted an implied exception. And in our prior opinion we left this question open, concluding only that § 13 could logically survive the 1900 repeal of the absolute bar to log driving. We therefore examine the thrust of the argument that Congress could not possibly have intended the Act to apply to this kind of case.

The defendants' argument is compelling in the abstract: Congress would not have wanted to subject the important activity of log driving to extermination under the Refuse Act. But, having in mind that the Act provided for the issuance of permits at the discretion of the Secretary, we ask whether Congress would prefer that the courts create a judicial exception for log driving (or vessel traffic), thus giving carte blanche to any pollution creating effects, or that the Secretary of the Army initiate a permit system, thus providing a system to place limits on pollution which may legally be caused. This, in a sense, is an academic question because through wisdom, oversight, or timorousness of the Secretary, the issue did not arise. But we think it is a question essential to the

necessarily artificial analysis of original Congressional intent.

We are helped in our attempt to devine the Congressional intent of 1899 by our knowledge of the limitations embodied in our institutions. If Congress, as the defendants would have it, left to the judiciary the delineation of exceptions covering normal incidents of commercial river navigation, the courts would have been required to pass upon a series of nice distinctions which arise in areas outside their expertise. The courts, in the context of specific cases, would have to face the task of defining "normal" or "acceptable" log driving. In addition to the problems of collecting and analyzing commercial, engineering, and pollution data, they would have to pass judgment on the maximum acceptable frequency of drives, condition and quantity of logs, seasonal considerations, places, duration and quantity of permitted storage.[1] Reference to the implementing regulations under the Federal Water Pollution Control Act, 33 U.S.C. § 1321(b)(3) *as amended*, relating to the discharge of oil, 40 C.F.R. §§ 110.1–110.9 (1975), illustrates the detail and scope of the necessary provisions.[2] When we confront the clear, cold reality of describing what we would be excluding from the scope of § 13, we conclude that we would be entering the field reserved to the agencies or the Congress,[3] with too much demand

1. Defendants claim the problem would not be this complex. They postulate that § 13 was devised to permit "use" but not "abuse" of the waterways. They say a user, i. e., someone engaged in the legitimate commercial navigation was intended to be excepted from the Act, while an abuser, i. e., someone else "whose activities, on the face of things, represented an abuse of public resources" would have the burden of persuading the Secretary to grant a permit. We do not see how such a distinction squares with the sweep of the Court's definition of "refuse" in *Standard Oil*. If the Act forbids the discharge into a river of a container of sludge located on shore, it must also forbid the pumping of bilge containing similar waste. If the Act forbids the choking of an inlet from the discharge of sawmill waste, it must forbid the same result accomplished by a pile-up of a neglected raft of logs. Yet if some activities relating to commercial navigation are clearly covered by the Act, the distinction between "users" and "abusers" becomes useless.

2. These regulations were promulgated pursuant to the Federal Water Pollution Control Act of June 30, 1948, as amended prior to October 18, 1972, 33 U.S.C. §§ 1151–71. The Federal Water Pollution Control Act, as amended in its entirety by Act of October 18, 1972, 33 U.S.C. §§ 1251–376, has superseded the 1948 Act but no similar regulations have been promulgated pursuant to its authority. We assume that the cited regulations are still in force.

Some idea of the variety and complexity which would be involved in refuse regulation of log driving can be gleaned from a scrutiny of the Corps of Engineers' regulations concerning navigation, 33 C.F.R. Ch. II, Part 207 (1975), a number of which apply to log driving activities.

3. Indeed, the account in *United States v. Boyd*, 491 F.2d 1163 (9th Cir. 1973), of the legislative history of the 1970 Act suggests what the attitude of Congress might well be when confronted with the task of drafting specific exceptions to a broad-based statutory proscription. The

for specificity to be the function of the courts.

The argument that Congress could not have meant the Act to carry its literal meaning, leaving to discretionary administrative action exemption for normal navigation, assumes the worst and ignores the availability of standard safeguards against administrative abuse. It assumes that the Secretary would act capriciously, with Draconian zeal, and without check to its fiat. Were this to happen, judicially cognizable defenses exist to deal with such uses of prohibitive powers. Discriminatory and selective enforcement would be vulnerable to legal challenge. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373–74, 6 S.Ct. 1064, 30 L.Ed. 220 (1885). Were the Secretary to apply the Act in an arbitrary and capricious manner, a court action would be available to mandate reasonable action. *See Work v. United States ex rel. Rives*, 267 U.S. 175, 183–84, 45 S.Ct.·252, 69 L.Ed. 561 (1925). Finally, there exists the safeguard of legislative response to administrative action. After Congress, in the 1972 Federal Water Pollution Control Act, barred "harmful" oil discharges, the Secretary of the Interior issued regulations making no exception for oil discharges from properly operating vessel engines. Congress responded with hearings and an exception was added to the regulations which was subsequently upheld in *United States v. Boyd*, 491 F.2d 1163 (9th Cir. 1973). Defendants make the point that if this action had been brought against KLD in late 1899, Congress would probably have responded similarly, and both the Secretary and the courts would have acquiesced. This may be true, but absent the occasion, we can only speculate, observing, however, that it is likely that fairly complex standards would have been promulgated to govern the exemption.

In sum, it is just as reasonable for us to suppose that Congress intended broad coverage of the Act and sensible administrative action as that it implicitly intended to exclude a wide range of activities that the Act facially encompassed.

This brings us to the argument that the Secretary never interpreted § 13 to apply to log drives. This administrative interpretation would have been entitled to some weight were it not for *PICCO*. But, in that case, the Court confronted the fact that until December, 1970, the Army Corps of Engineers had consistently construed § 13 as limited to deposits of refuse affecting navigation. This fact, however, was assumed to have no bearing on the question of whether § 13 applies to deposits that have no tendency to affect navigation—at least since the Court's decision in *Standard Oil, supra.* Administrative practice was not germane to a finding of violation, but reliance on such practice was held to be available as a defense in a criminal prosecution. 411 U.S. at 674, 93 S.Ct. 1804.[4]

We therefore affirm the district court's conclusion that § 13 is applicable to defendant's log driving activities.[5]

opinion quotes the following remarks for the Senate senior conferee, Senator Muskie:

"It was conceivable that de minimis quantities of oil ought not to be subject to the notice provisions and ought not to be subject to the penalty provisions of the law. It was difficult to define these quantities in the statute.

"The definition, we felt, would depend upon more extensive study than we could give, and even if we were in a position to give that kind of study, there were other reasons why such specificity ought not to be included in the law." 491 F.2d at 1167 n. 4.

4. Defendants make one additional argument—that their actions did not come within the words of the statute—"deposit" "cause" or "suffer"—because the only way to avoid sinkage would have been to abstain from log driving. This, however, is only a semantically different version of the earlier argument we have considered in the text.

5. While we have no occasion so to hold, it might be inferred that § 13 is also applicable to vessel navigation. It is possible, however, that vessel traffic raises problems unaddressed in the present litigation. While a ruling holding § 13 applicable to oil seepage from normal lawful navigation would render past voyages of vessels illegal under the Refuse Act, it would have little practical importance today. The permit program authorized by the Refuse Act is now administered by the Environmental Protection Agency under the Federal Water Pollution Control Act. (FWPCA) 33 U.S.C. § 1342(a)(5). Whatever the status of vessel

**450**

Defendants have suggested that such a ruling be applied only prospectively, on the ground that the issue involved here is one "of the first impression whose resolution was not clearly foreshadowed". *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971). We think that the question of the availability and extent of retrospective relief would be more properly considered in the district court on remand.

*Affirmed.*

LEVIN H. CAMPBELL, Circuit Judge (concurring).

I concur in the result, although I am not sure I follow the reasoning of the court in all respects. I find it enough that the Supreme Court's interpretation in *United States v. Standard Oil* is the controlling interpretation of the statute today, including, functionally, of the "legislative intent." Whether it is a revisionist interpretation or not, it is binding upon us. Whatever people may once have thought, § 13 now means what the Court in *Standard Oil* said. It follows that as the pollutants in question are "refuse" under § 13, the statute applies. And I agree with the court that since § 13 allows administrative permits, those rather than judicially created exceptions would be the congressionally preferred means for excepting special types of refuse as to which an exemption might be in order.

Obviously, different questions arise when one considers the equities of imposing clean-up requirements for actions that may have been undertaken in good faith under an earlier construction of the law. The district court, like ourselves, has shown itself to be well aware of these issues, which will be the subject of future hearings on the question of relief.

---

navigation under the Refuse Act, discharges from properly operating vessel engines have been exempted by regulation from the otherwise complete coverage of the oil spill provisions of the FWPCA, 33 U.S.C. § 1321. *See*

*United States v. Boyd, supra.* As a corollary, it is clear that oil discharged from vessels which is not normal seepage from a properly operating engine is subject to the proscriptions and penalties of the FWPCA.